569 A.2d 202

**Harinath S. MEDA**

v.

**Dorothy Virginia BROWN, et vir.**

**No. 38, Sept. Term, 1988.**

Court of Appeals of Maryland.

Feb. 7, 1990.

Ronald U. Shaw (Timothy L. Mullin, Jr., Stephen J. Hughes, Daniel R. Lanier, Miles & Stockbridge, all on brief), Baltimore, for petitioner & cross-respondent.

John R. Penhallegon, Smith, Somerville & Case, both on brief, Baltimore, amicus curiae, for The Maryland Ass'n of Defense Trial Counsel.

Gilbert H. Robinette (Henry E. Dugan, Jr., Robinette, Dugan & Jakubowski, P.A., all on brief), Baltimore, for respondent & cross-petitioners.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL *, JJ.

McAULIFFE, Judge.

This case involves the use of inferences to prove a claim of medical malpractice. Two medical experts, testifying for

---

* BLACKWELL, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

the plaintiff,[1] relied in part upon an inference of negligence in reaching the conclusion that substandard care on the part of the defendant anesthesiologist caused the plaintiff to suffer a radial nerve injury. The jury found in favor of the plaintiff, but the trial judge granted the defendant's motion for judgment notwithstanding the verdict, holding that there was no legally sufficient evidence to support the verdict, because

> [t]he testimony of plaintiff's two experts ... rested upon inferences and thus constituted the kind of *res ipsa loquitur* evidence barred by *Hans [v. Franklin Square Hosp.*, 29 Md.App. 329, 347 A.2d 905 (1975), *cert. denied*, 276 Md. 744 (1976) ].

The plaintiff appealed. The Court of Special Appeals reversed and directed the entry of judgment in accordance with the verdict of the jury. *Brown v. Meda*, 74 Md.App. 331, 537 A.2d 635 (1988). The court held that the concept of *res ipsa loquitur* was applicable because laymen could properly infer negligence from the happening of an unusual injury to a healthy part of the patient's body remote from the area of the operation, and because the applicability of *res ipsa loquitur* in this case was further validated by the presence of expert testimony. *Id.* at 345, 537 A.2d 635. Significantly, the court also noted that "whether we refer to the facts herein as *res ipsa loquitur* or as proof of negligence by circumstantial evidence the result is the same." *Id.* at 345 n. 2, 537 A.2d 635.

We affirm, not on the basis of the applicability of *res ipsa loquitur*, but because the testimony was sufficient to support the inferential conclusion of negligence drawn by the plaintiff's experts.

Dorothy Virginia Brown underwent bilateral breast biopsy surgery, under general anesthesia, at Sinai Hospital in Baltimore. The anesthesiologist in charge of her case was

---

**1.** There are two plaintiffs in this case. For convenience, we refer only to the principal plaintiff, Dorothy Virginia Brown, and not to her husband, who joined for purposes of a consortium claim.

Dr. Harinath S. Meda. There was testimony at trial that it was the duty of the anesthesiologist not only to administer anesthesia and periodically monitor vital signs, but also to assure that the patient was properly positioned so as to prevent the application of pressure against certain vulnerable nerves and blood vessels. According to the plaintiff's experts, this latter duty of the anesthesiologist extends not only through the operative procedure, but also into the recovery room, and, in the opinion of one expert, "until the patient is fully recovered from anesthesia."

Mrs. Brown entered the operating room shortly before noon. She was in surgery until 1:50 p.m. She was admitted to the recovery room at 1:55 p.m., at which time she was reported to be responding to painful stimulus. She was moved from the recovery room to the floor at 4:45 p.m., when she was noted to be "alert and awake." Mrs. Brown described herself as "groggy" and not completely aware of her surroundings until the following morning. At that time, she said she noticed, and complained to the nurses of, pain, numbness, and tingling in the right hand, and particularly in the fourth and fifth fingers of that hand. This condition, which persisted and to some degree remains permanent, was diagnosed as an injury to the ulnar nerve—a nerve that originates in the area of the shoulder and extends into the hand, providing motor and sensory functions to a part of the hand, including part of the fourth and all of the fifth fingers.

Mrs. Brown thereafter filed a claim with the Health Claims Arbitration Office, alleging malpractice on the part of Dr. Meda, other doctors and other nurses, and Sinai Hospital. Prior to a hearing by the Health Claims Arbitration panel, the plaintiff dismissed her claims against everyone except Dr. Meda, Sinai Hospital, and a nurse anesthetist. The panel found in favor of Sinai Hospital and the nurse anesthetist, but found Dr. Meda liable and awarded the plaintiff $300,000 in damages. Dr. Meda rejected the arbitration panel's award. The plaintiff filed a complaint in the Circuit Court for Baltimore City, naming Dr. Meda as

the sole defendant. A jury found in favor of the plaintiff and awarded her $600,000 in damages. As we have noted, the trial judge granted the defendant's motion for judgment notwithstanding the verdict, and the Court of Special Appeals reversed the action of the trial judge. We granted certiorari.

The trial judge was correct when, in granting the motion for judgment notwithstanding the verdict, he concluded that the opinion of the plaintiff's experts rested, at least in part, upon inference. He erred, however, when he concluded that dependence upon an inference necessarily means that the concept of *res ipsa loquitur* is invoked.

The Latin phrase, *res ipsa loquitur*, used by Baron Pollock in the case of *Byrne v. Boadle*, 2 H. & C. 722, 159 Eng.Rep. 299 (1863), means, in its simplest terms, that "the thing speaks for itself." Dean Prosser describes the later utilization of the phrase as follows:

> From that casual utterance, dignified and magnified by the cloak of the learned tongue, there has grown by a most extraordinary process the 'doctrine' of res ipsa loquitur. It is a thing of fearful and wonderful complexity and ramifications, and the problems of its application and effect have filled the courts of all our states with a multitude of decisions, baffling and perplexing alike to students, attorneys and judges.

W. Prosser, *Res Ipsa Loquitur in California*, 37 Calif.L. Rev. 183 (1949). Former Chief Judge Bond, dissenting in the case of *Potomac Edison Co. v. Johnson*, 160 Md. 33, 40–41, 152 A. 633 (1930), earlier expressed similar disenchantment with the use being made of the phrase:

> It adds nothing to the law, has no meaning which is not more clearly expressed for us in English, and brings confusion to our legal discussions. It does not represent a doctrine, is not a legal maxim, and is not a rule. It is merely a common argumentative expression of ancient Latin brought into the language of the law by men who were accustomed to its use in Latin writings.

\* \* \* \* \* \*

It may just as appropriately be used in argument on any subject, legal or otherwise. Nowhere does it mean more than the colloquial English expression that the facts speak for themselves, that facts proved naturally afford ground for an inference of some fact inquired about, and so amount to some proof of it. The inference may be one of certainty, as when an excessive interest charge appeared on the face of an instrument, or one of more or less probability only, as when negligence in the care of a barrel of flour was found inferable from its fall out of a warehouse.

■ More recently, Judge Orth, writing for the Court of Special Appeals in *C. & P. Tel. Co. v. Hicks,* 25 Md.App. 503, 337 A.2d 744 (1975), *cert. denied,* 275 Md. 750, provided an excellent review of the development of *res ipsa loquitur* in Maryland, and noted that the three criteria generally required for the creation of an inference of negligence on the part of a defendant in such cases are:

1. A casualty of a sort which usually does not occur in the absence of negligence.
2. Caused by an instrumentality within the defendant's exclusive control.
3. Under circumstances indicating that the casualty did not result from the act or omission of the plaintiff.

*Id.* at 516, 337 A.2d 744.

The question of the legal effect of successfully invoking *res ipsa loquitur* has been the subject of substantial debate, and the source of some earlier confusion in this State. *See* R. Thomsen, *Presumptions and Burden of Proof in Res Ipsa Loquitur Cases in Maryland,* 3 Md.L.Rev. 285 (1939). It is now clear, as the Court of Special Appeals pointed out in *Hicks,* that Maryland follows the view of the vast majority of the courts in this country, and of the Restatement,[2] in concluding that when the criteria of *res*

---

2. *Restatement (Second) of Torts* § 328D (1965).

*ipsa loquitur* have been satisfied, an inference of negligence may be drawn.

We believe that the true interpretation of *res ipsa loquitur* in Maryland, despite apparent inconsistencies in discussing it, is that espoused by the great majority of American courts. The doctrine merely provides a permissible inference of negligence. This means that the inference of negligence to be drawn from the circumstances is left to the jury. They are permitted, but not compelled to find it. As for the plaintiff, the doctrine furnishes sufficient evidence to go to the trier of fact. As for the defendant, the burden of proof is not shifted to him, nor is any burden of introducing evidence cast upon him, except in the very limited sense that if he fails to do so, he runs the risk that the trier of fact may, and very likely will, find against him. In other words, he has no duty to go forward with the evidence, but by not doing so he runs the risk of non-persuasion. Of course, there will be occasional cases where the inference of negligence is so clear that no reasonable man could fail to accept it. In such cases, if the defendant offers no explanation, a verdict should be directed for the plaintiff. 'In other words', Prosser says, § 40 at p. 230, 'the procedural effect of a res ipsa case is a matter for the strength of the inference drawn, which will vary with the circumstances of the case.'

*Hicks, supra,* 25 Md.App. at 529–30, 337 A.2d 744.

■ Mrs. Brown's case did not go to the jury on a theory of *res ipsa loquitur.* No instruction on *res ipsa loquitur* or the required criteria for the application of that concept was given. The plaintiff offered proof of negligence on the part of Dr. Meda through the testimony of Dr. Gary Belaga, a neurologist, and Dr. John Rybock, a neurosurgeon.

The closest that this case comes to reliance upon *res ipsa loquitur* is in the inferential reasoning process used by the plaintiff's experts in arriving at their conclusions that Dr. Meda was negligent. As we shall see, neither Dr. Belaga nor Dr. Rybock could testify as to the precise act of

negligence that caused injury to Mrs. Brown's ulnar nerve. Each doctor, based upon his knowledge of the facts and upon his expertise, concluded that Mrs. Brown's injury was one that ordinarily would not have occurred in the absence of negligence on the part of the anesthesiologist. This inferential reasoning has a familiar ring to it. It is a major part of the concept of *res ipsa loquitur*. It is not, however, *res ipsa loquitur*. *Res ipsa loquitur*, as we now utilize that concept in the law of negligence, means that in an appropriate case the jury will be permitted to infer negligence on the part of a defendant from a showing of facts surrounding the happening of the injury, unaided by expert testimony, even though those facts do not show the mechanism of the injury or the precise manner in which the defendant was negligent. The jurors in this case were not told that they could make such a finding. Accordingly, this case does not present the question of whether the plaintiff might have relied on *res ipsa loquitur* by simply showing the facts of the occurrence unaccompanied by expert testimony.

■ We turn to the question of whether the foundations upon which the opinions of the plaintiff's experts were based were so deficient that those opinions should not have been received and the judgment based upon those opinions should be reversed. Dr. Belaga, a board certified neurologist who had been Chief of Neurology at South Baltimore General Hospital from 1974 to 1985, testified that the defendant's conduct did not measure up to the standard of care owed to Mrs. Brown, and that the violation of the standard of care caused the ulnar nerve injury. We summarize and paraphrase Dr. Belaga's testimony in the following paragraph.

The probable cause of Mrs. Brown's ulnar nerve injury was sustained compression of the ulnar nerve for thirty

minutes or more during surgery.[3] The ulnar nerve is particularly vulnerable to compression injury at the elbow, and the weight of the arm is sufficient to produce injury if the nerve is compressed due to the position of the arm. The normal protective response of the body to a painful or tingling sensation produced by ulnar nerve compression will ordinarily cause a person to change the position of the affected arm before any harm is done to the nerve, even when the person is asleep. A person under anesthesia, however, will not respond to painful stimuli, and therefore there is a deprivation of the body's normal protection against compression nerve injuries. Moreover, a patient's arms are normally strapped in a predetermined position before surgery, so that the position in which the arm is originally placed is likely to remain unchanged throughout the procedure. The particular susceptibility of the ulnar nerve to compression injury during surgery is well known in the medical profession, and the standard of care requires that the arm be positioned and secured in such a manner that nerve compression will not occur. This positioning, and the protection of the patient from compression nerve injury while under the effect of anesthesia, is primarily the duty of the anesthesiologist. In recognition of the known danger of ulnar nerve injury, the patient's arm is protected by securing it to a cushioned arm board. The arm must be positioned on the arm board so that the ulnar nerve is protected, and the arm must be securely taped so that it will not rotate on the board, thus changing the position and possibly exposing the nerve to compression. Care must also be taken to insure that the ulnar nerve is not com-

---

3. Dr. Belaga conceded that there are other possible causes of ulnar nerve injury of the type suffered by Mrs. Brown, including leprosy, lead poisoning, recurrent trauma through the use of a jackhammer, or a substantial blow to the nerve (as opposed to a casual bump). He ruled out certain of these possibilities in Mrs. Brown's case, and, relying upon his medical knowledge of the frequency of such injuries while the patient is under anesthesia and the temporal significance of the onset of symptoms, he concluded it was probable that the injury occurred during surgery.

pressed by any part of the board, or cushion, or sheet or towel covering the board. A compression ulnar nerve injury will not occur if the arm is properly positioned and secured on the arm board.

Dr. Belaga could not say whether Mrs. Brown's ulnar nerve was compressed by contact with the edge of the board, the cushion, the rigid edge of the cushion, or some crease or fold in the covering of the board. Nor could he say whether the arm had been improperly positioned at the start of the operation, or properly positioned but improperly secured so that it later rotated to an improper position. He testified, however, that it was his opinion within reasonable medical probability that the injury to Mrs. Brown's ulnar nerve occurred in the operating room, and as a result of one of these causes, and that to permit that to happen was not in keeping with the standard of care required of the anesthesiologist.

Dr. John Rybock, a board certified neurosurgeon who practiced at Johns Hopkins Hospital and served as an assistant clinical professor at Johns Hopkins University, offered similar testimony on behalf of the plaintiff.[4] He also concluded that "there was a deviation from the standard of care in that Dr. Meda failed to adequately protect the ulnar nerve during the procedure."

It is apparent that each doctor relied in part on circumstantial evidence in reaching his opinion that Dr. Meda was negligent. The defendant argues that this is impermissible —that because the experts who testified for the plaintiff could not identify with particularity the specific act of negligence and precise mechanism of injury, their testimony is mere speculation or conjecture. We do not agree, and we disapprove *Hans v. Franklin Square Hosp.*, 29 Md.App. 329, 347 A.2d 905 (1975), *cert. denied*, 276 Md. 744 (1976), upon which the defendant based his argument. We have long held that "[n]egligence, like any other fact, can be

---

4. Dr. Rybock did not agree that a fold in the sheet that covered the arm board would be likely to cause ulnar nerve compression.

established by the proof of circumstances from which its existence may be inferred." *Western Md. R. Co. v. Shivers*, 101 Md. 391, 393, 61 A. 618 (1905).

It would appear that the defendant may have confused the question of whether an inference may be drawn by an expert with that of whether an inference may be drawn by a layman. If this plaintiff had offered no expert testimony, but had simply shown the onset of an ulnar nerve injury to her arm following a breast biopsy, the jury would not have been permitted to infer negligence from the facts alone. Although we have recognized that in the occasional "obvious injury" case the common knowledge of jurors may be sufficient to support an inference or finding of negligence on the part of a health care provider, we have made it clear. that in the ordinary medical malpractice case, because of the complexity of the subject matter, expert testimony is required to establish negligence and causation. *Broadwater v. Arch*, 267 Md. 329, 297 A.2d 671 (1972); *Thomas v. Corso*, 265 Md. 84, 288 A.2d 379 (1972); *Crockett v. Crothers*, 264 Md. 222, 285 A.2d 612 (1972); *Johns Hopkins Hospital v. Genda*, 255 Md. 616, 258 A.2d 595 (1969); *Fink v. Steele*, 166 Md. 354, 171 A. 49 (1934); *McClees v. Cohen*, 158 Md. 60, 148 A. 124 (1930).

In the case before us, however, the jurors were not asked to draw an inference unaided by any expert testimony. The plaintiff's experts, armed with their fund of knowledge, drew certain inferences from the circumstances. Having examined the testimony of the experts, we conclude that the trial judge did not err in permitting that testimony and allowing the doctors to base their opinions on a combination of direct and circumstantial evidence. The doctors recited in detail the physical facts they considered, and the medical facts they added to the equation to reach the conclusion they did. The facts had support in the record, and the reasoning. employed was based upon logic rather than speculation or conjecture.

The testimony of the plaintiff's experts adequately established the duty owed by the defendant to the plaintiff, a

breach of that duty, causation, and damage. The jury's verdict should have been permitted to stand.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.