695 A.2d 191

**COGAN KIBLER, INC.**

**v.**

**Mary Alice VITO.**

**No. 44, Sept. Term, 1996.**

Court of Appeals of Maryland.

June 20, 1997.

Denise A. Greig, Semmes, Bowen & Semmes, on brief, Baltimore, for petitioner.

Monroe Jon Mizel, Kensington, Thomas P. Ryan (McCarthy, Wilson & Ethridge, on brief), Rockville, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, RAKER and WILNER, JJ.

RODOWSKY, Judge.

This negligence claim alleges personal injuries resulting from the inhalation of paint primer fumes in a business office during working hours. At issue is the sufficiency of the plaintiff's evidence of the defendant painter's primary negligence. The circuit court held that the plaintiff failed to satisfy the requirements of a *res ipsa loquitur* case. The Court of Special Appeals held that those requirements were satisfied. *Vito v. Sargis & Jones, Ltd.,* 108 Md.App. 408, 672 A.2d 129 (1996). We shall affirm the Court of Special Appeals because, without the need to rely on *res ipsa loquitur,* the plaintiff circumstantially proved primary negligence.

The action before us arises out of an occurrence on Friday, May 11, 1990, that took place in a multi-story office building at 2240 Broad Birch Drive in Silver Spring, Maryland that is occupied by *USA Today*'s publisher (USAT). USAT had moved to the building in Silver Spring from Rosslyn, Virginia in 1986. In May 1990 certain construction work was being performed within the USAT building. At least some of that work was being performed in an area adjacent to, and previously separated by an interior wall from, the area occupied by

USAT's customer service department (the Department). At that time one of the respondents, Alice M. Vito (Vito), was a customer service representative in the Department. The prime contractor for the construction work was the other respondent, Sargis & Jones, Ltd. (S & J). S & J's painting subcontractor for the USAT project was the petitioner, Cogan Kibler, Inc. (C–K).

In the late morning of May 11, 1990, one of C–K's employees, John Dray (Dray), was applying paint primer to a wall within the work area adjacent to the Department. Dray had been applying the primer, by his estimate for approximately twenty minutes, when "at some point" the S & J supervisor told Dray to stop working because of a complaint that Dray said related to the smell. According to USAT's Customer Service Manager at the time of the occurrence and of trial, Carolyn C. Webb (Webb), eight people in the Department were complaining "that their eyes were burning, . . . their throats were hurting and they weren't feeling well." One of these persons was Vito.

Vito sued S & J and C–K, and C–K cross-claimed against S & J. The case was tried to a jury. At the conclusion of the plaintiff's case both defendants moved for judgment, and the court "reserved" ruling. Neither defendant elected to stand on the record. Two witnesses, called by the defendants, testified in the defendants' case before the court ruled. These were Webb and Dr. Elliott Goldstein, a pulmonologist. At the conclusion of proceedings on the day when these defense witnesses testified, the court entered judgment in favor of the defendants as a matter of law. Under these circumstances the testimony of the two defense witnesses forms part of the record for determining the sufficiency of the plaintiff's evidence of liability.[1]

---

1. Vito raises no issue under Maryland Rule 2–519 concerning the procedure followed by the trial court. Specifically, Vito does not argue that the defendants withdrew their motions for judgment by offering evidence, and Vito does not argue that the trial court lacked any mechanism for granting judgment during the presentation of the defen-

On Vito's appeal the Court of Special Appeals reversed as to C–K, concluding that Vito had presented facts sufficient to invoke *res ipsa loquitur*. *Vito v. Sargis & Jones, Ltd.*, 108 Md.App. at 433, 672 A.2d at 141–42. With respect to S & J, the Court of Special Appeals affirmed because there was insufficient evidence to support a finding that Dray was the servant of S & J. *Id.* at 433–35, 672 A.2d at 142. The matter was remanded to permit C–K to complete producing evidence on its cross-claim against S & J. *Id.* at 434–35, 672 A.2d at 142.

C–K petitioned this Court to review the determination adverse to C–K by the Court of Special Appeals. There was no cross-petition by Vito seeking review of the affirmance of the judgment in favor of S & J. Nor does S & J seek review of that portion of the mandate permitting C–K's cross-claim to continue.

C–K's principal argument to us is that *res ipsa loquitur* cannot be applied here as a matter of law because C–K did not have exclusive control over the heating, ventilating, and air conditioning (HVAC) system in the USAT building which, C–K contends, delivered the fumes from the area where Dray was working to the Department. The short answer to this contention is that the evidence most favorable to the plaintiff permits an inference that that portion of the building's HVAC system that would serve the area where Dray was working was not yet in service. The long answer to C–K's contention is that Vito produced sufficient evidence of negligence on the part of C–K without the need to rely on *res ipsa loquitur*.

■ In resolving the issue before us, we are not concerned with the extent of the harm to the plaintiff, even though the record of the aborted trial reflects the nature and extent of Vito's injury to have been vigorously contested. For present purposes the sensations of burning in the eyes and throat and of nausea are sufficient harm to support some compensatory

dant's case when no motion for judgment was pending. We intimate no opinion on these questions.

damages, if Vito established the other elements of the tort of negligence.

The presentation of Vito's case did not include any floor plan of the areas of the USAT building involved in the occurrence, any diagram of the HVAC system or systems in those areas, or any orderly and detailed description of those areas in the testimony of a witness called for that purpose. Consequently, our statement of the evidence most favorable to the plaintiff, set forth below, is based on bits of testimony from a number of witnesses.

The Department was located on the same level of the building that formed the bottom of the building's atrium. The Department adjoined the atrium, and for some distance along their common boundary the atrium and the Department were separated by a wall. The Department occupied a large area that was divided into approximately seventy workstations for the customer service representatives. They responded to telephone inquiries and complaints from USAT customers. The height of the partitions separating the representatives' workstations one from another did not reach to the ceiling of the room. The upper portion of the room was entirely open, permitting a clear field of vision for two or more supervisors who worked on elevated platforms in the Department.

This area was equipped with air conditioning. Vito said her workstation was directly beneath one of the "air conditioning ducts" in the Department. Jurors could have understood the term "duct" to mean a vent or opening in the ductwork (either exposed or concealed) of the HVAC system. The record does not inform us, however, whether that vent brought fresh or cooled air into the Department, or whether it drew return air from the Department.

Construction work adjacent to the Department had been ongoing for a number of weeks prior to May 11, 1990. The purpose was to expand the Department into space previously forming part of the atrium. The work included cutting through the wall between the Department and the atrium and creating offices for the Department in the former atrium

space.[2]  After the construction workers had cut through the wall, they hung a plastic sheet over the opening. This plastic sheet was not stapled or taped closed but simply hung loosely. Vito's workstation was within a few feet of the construction activity, which produced loud noise, "different weird smells here and there," and "a lot of dust flying around."  The evidence is that, prior to May 11, 1990, no person in the Department became ill for any reason associated with the construction activity in the expansion area.

Sometime prior to midday on May 11, 1990, Dray began applying paint primer to the newly constructed walls of the offices in the expansion area, using Duron Stain Killer.  The manufacturer's label on cans of Duron Stain Killer contained the following warning in a square formed by a black border around the text.

### "CONTAINS PETROLEUM DISTILLATE

"Keep away from heat and flame.  To avoid breathing vapors or spray mist, open windows and doors or use other means to ensure fresh air entry during application and drying.  If you experience eye watering, headaches or dizziness, increase fresh air or wear respiratory protection ... or leave the area.  Close container after each use.  Avoid contact with skin.

**FIRST AID:** If swallowed, do not induce vomiting.  Call physician immediately.

**Use With Adequate Ventilation.**

**NOTICE:** Reports have associated repeated and prolonged occupational over-exposure to solvents with permanent brain and nervous system damage.  Intentional misuse by

---

2.  The conflict in the evidence includes the description of the construction project.  S & J's construction manager testified that the project basically consisted of renovating bathrooms and storage areas.  Webb described the project as the construction of new offices out of the atrium, *i.e.,* enclosing formerly open interior space.  The latter version would require erecting new walls for the offices, and it is the version more favorable to the plaintiff, inasmuch as the jury could conclude that new walls would require more paint primer.

deliberately concentrating and inhaling the contents may be harmful or fatal.

## KEEP OUT OF REACH OF CHILDREN"

Dray applied Duron Stain Killer by first pouring it into a pan and then rolling it onto the walls by means of a paint roller with an extension attached to the roller arm. Stain Killer is non-pungent and has virtually no odor. Dray did not suffer any ill effects while working with it. Dray could not recall whether there were any outside windows or doors in the area where he was applying the primer, and there is no evidence from any other source on the subject.

Sometime after Dray began applying Duron Stain Killer in the expansion area, and prior to the time when S & J's supervisor advised Dray that there had been a complaint, one of Vito's co-workers became ill. Webb's superior helped that customer service representative out of the building "because she was getting very sick, like she was going to get sick to her stomach." Thereafter approximately eight more employees, including Vito, became ill. Vito testified that she "passed out" and had to be assisted in leaving the building. The USAT supervisory personnel immediately sent the ill employees outside. Webb then ordered all of the Department employees out of the building. Indeed, the entire building was evacuated.

Four or five ambulances had been called to the USAT building, and the paramedics set up triages on the scene, identifying persons who should be taken to a hospital and those who needed no further examination or treatment. Vito was among those who were taken to Holy Cross Hospital. Webb identified, by name, six other employees who were also taken to that hospital.

Webb, who suffered no ill effects whatsoever, went to Holy Cross Hospital to "stay with the people that were sick." By 4:00 p.m. that day the hospital had released all of the USAT employees, other than Vito. Vito, a longtime smoker with a history of asthma, was given oxygen and placed on a monitor,

and the hospital did not release her until around 5:00 p.m. on the day of the occurrence.

Webb returned to the USAT building from the hospital in order to pick up her belongings. On cross-examination she testified as follows:

"Q Now, when you came back to USA Today were there still fire engines and ambulances around?

"A No.

"Q Were there exhaust fans turned on?

"A There were three large fans in the facility."

The jury could have considered the answer to the second quoted question as a responsive answer, but one intended to convey that portable fans had been brought into the "facility" to clear it.

■ Vito presented evidence from which the jury could find all of the elements of a negligence claim. In *Graham v. Canadian Nat'l Ry. Co.,* 749 F.Supp. 1300 (D.Vt.1990), property owners sued for personal injuries and property damage resulting from a railroad's application of herbicides along its right of way adjacent to the plaintiffs' properties. With respect to the defendant's duty, the court said:

"The herbicide is marketed under a label which publishes precautionary instructions that it may present hazards to the environment with specific reference to workers exposed in the area to be treated 'directly or through drift.' The label warns that exposure 'MAY IRRITATE EYES, NOSE, THROAT AND SKIN.'

"The presence of known danger created the duty of reasonable care on the part of the railroad to avoid injury to the plaintiffs and their animal stock. Indifference to the consequences of dealing with a hazardous substance is lack of due care."

*Id.* at 1318.

C–K's employee, Dray, was on notice from the warning label on cans of Duron Stain Killer that its fumes could be harmful, absent adequate ventilation. Dray also knew, or should have

known under the circumstances, that there were people working in the Department, on the other side of the plastic sheet. Dray was negligent, the jury could find, in failing to insure adequate ventilation. If the jury concluded that it was highly unusual for ten percent of the population of the Department to be so adversely affected by the fumes as to require hospital examination, the jury could also infer that any belief by Dray that there was adequate ventilation under the circumstances was unreasonable. Thus, duty and breach were sufficiently proved.

Proximate causation and harm are not issues on this appeal. The parties stipulated that the testimony from Vito's medical witnesses "if believed by the jury, established that Ms. Vito suffered permanent lung damage as a result of inhaling the fumes from the paint primer on May 11, 1990." *Vito v. Sargis & Jones, Ltd.*, 108 Md.App. at 414–15 & 415 n. 2, 672 A.2d at 132–33 & 133 n. 2.

C–K's argument depends wholly on this Court's classifying the plaintiff's proof as an application of *res ipsa loquitur. Res ipsa loquitur* apparently was first injected into this case by plaintiff's counsel in off-the-record conversations with defense counsel and the trial judge. In any event, the arguments by the defendants in support of their motions for judgment at the end of the plaintiff's case treated the evidence as if *res ipsa loquitur* were the correct analysis. We have said that successful invocation of the *res ipsa loquitur* doctrine requires the plaintiff to prove three elements: (1) a casualty of a sort which usually does not occur in the absence of negligence; (2) caused by an instrumentality within the defendant's exclusive control; and (3) under circumstances indicating that the casualty did not result from the act or omission of the plaintiff. *Dover Elevator Co. v. Swann,* 334 Md. 231, 236–37, 638 A.2d 762, 765 (1994).

C–K argues that the second element of a *res ipsa loquitur* case is missing in the instant matter. The argument is that the paint primer fumes are not, in and of themselves, the instrumentality of the harm, but that the paint primer

fumes required a delivery system. C–K says that the delivery system was the HVAC system that was under the control of USAT and not of C–K. Thus, C–K concludes that the plaintiff's case fails.

There is, however, no direct evidence that, in the Department expansion area where Dray was applying Stain Killer, an HVAC system had even been installed, or if installed, that it was functioning. Indeed, the inference is that a system, if installed and connected, was not functioning. Inasmuch as a section of the wall between the Department and the expansion area was open, and covered by a plastic sheet, the jury could conclude that the HVAC system had not been balanced for the expansion area and was not routinely running there. This conclusion is reinforced by the interpretation of the evidence under which portable fans were brought into the facility in order to clear the Stain Killer fumes.

█ In any event, it is immaterial to the resolution of the issue before us whether the HVAC system was operating in the Department and not in the expansion area, or whether it was operating in both. If, for example, a defendant spilled a toxic chemical in the out-of-doors, and the fumes were borne by ambient air to a plaintiff who inhaled the fumes and was harmed, the defendant's lack of control over the ambient air would not insulate the defendant from liability. In the instant matter, where the chemical was exposed indoors, the fact that the atmosphere may be artificially created does not alter the result. C–K had the duty to use care in releasing the fumes, and the indoor atmosphere was one of the circumstances to be taken into consideration in executing that duty. Inasmuch as the customer service representatives experienced no adverse reactions to the atmosphere in the Department until Duron Stain Killer was applied in the expansion area, malfunctioning of the HVAC system was not an intervening cause at the time of the occurrence.

Even if the HVAC system was the delivery vehicle for the fumes that affected Vito, and even if that system was not in the exclusive control of C–K, Vito nevertheless presented a

*prima facie* case because her claim does not depend on *res ipsa loquitur.* "The close resemblance or relationship which may exist between what may be classified as *res ipsa loquitur* cases and cases in which a direct inference of the defendant's negligence may be drawn from particular facts, has been pointed out more than once." *Nalee, Inc. v. Jacobs,* 228 Md. 525, 531, 180 A.2d 677, 680 (1962). The accident in *Nalee* occurred in a restaurant and involved a heavy bench. The bench was constructed in two pieces, one piece a heavy wooden frame with a rectangular base and an upholstered back and the second piece an upholstered seat which fitted on the base. When two patrons who were seated on the bench leaned forward, the bench tipped forward. The entire seat slipped off the frame and fell to the floor, striking the foot of a third person, the plaintiff. *Id.* at 527, 180 A.2d at 678. We held that the known facts supported the direct inference that the defendant was negligent in failing to have the bench securely fastened to the floor. Consequently, in *Nalee* it was "unnecessary to decide the interesting questions relating to *res ipsa loquitur* which [had] been raised and ably presented by the appellant." *Id.* at 531–32, 180 A.2d at 680.

In *Nalee* the plaintiff did not produce evidence directly describing the absence of fastenings between the bench and the restaurant floor, but the absence was proved by inference. Here, Vito did not offer direct evidence describing the absence of sufficient ventilation in the expansion area, but the inference that there was insufficient ventilation is one that the jury could draw. *See also Meda v. Brown,* 318 Md. 418, 424, 569 A.2d 202, 205 (1990) ("The closest that this case comes to reliance upon *res ipsa loquitur* is in the inferential reasoning process used by the plaintiff's experts in arriving at their conclusions that [the defendant] was negligent.").

C–K submits that *Frenkil v. Johnson,* 175 Md. 592, 3 A.2d 479 (1939), controls the result in the instant matter. In *Frenkil* the plaintiff, while seated in his automobile on a public street, was injured by debris propelled by the explosion of illuminating gas in a nearby building. The three-story building was in the process of being razed by the defendant's

workers who had removed the roof and who were using pinch bars to dismantle the brick walls of the third floor when the explosion occurred. *Id.* at 596–97, 3 A.2d at 480–81. The workers had detected gas prior to the explosion and reported the leak to the gas company which had capped the service pipes where they entered the building. Nevertheless, gas continued to enter the building in the cellar and spread throughout the building. The presence of gas was known to the workers, because of the odor, but they did not advise the gas company that the escape of gas into the building had not been stopped. *Id.* at 598, 3 A.2d at 481. After the explosion the gas leak was found to be under the public street, some fifteen feet beyond the building line. *Id.* at 598–99, 3 A.2d at 481–82. Judgment on a jury verdict against the defendant was affirmed. *Id.* at 607–09, 3 A.2d at 485–86.

We are unable to share C–K's belief that *Frenkil* is helpful to its argument. *Frenkil* did not present a *res ipsa loquitur* analysis. Further, the explosion in *Frenkil* required both the accumulation of gas and an ignition source, and that ignition source was unknown. *Id.* at 607–08, 3 A.2d at 485–86. It may have been an act of an employee of the defendant or of a passerby on the public way. This Court reasoned that the defendant's negligence in failing to report the continued escape of gas was *a* proximate cause of the explosion, so that the jury could find that the defendant was liable even if the defendant's negligence operated concurrently with the negligence of an unknown third party. *Id.* at 608, 3 A.2d at 486. Applying that analysis to the instant matter would mean that the jury could find that C–K was negligent, and that its negligence was a proximate cause of Vito's injury even if USAT were concurrently negligent in its control of the HVAC system.

C-K emphasizes that part of this Court's opinion in *Frenkil* that refers to the contractor's exclusive control over the building. We said:

> "The breach of duty owed by the defendant to the traveler on the highway was the former's failure to use the premises of which he was then in the exclusive possession with that

degree of care and diligence which an ordinarily prudent man would, under similar conditions, have reasonably exercised, so as to prevent the dangerous state of the premises to become the proximate cause of injury to a traveler in the lawful and careful use of an adjacent municipal highway." *Id.* at 602, 3 A.2d at 483. In *Frenkil* the defendant's exclusive control was important in giving rise to a legal duty on the part of the defendant who was not responsible for introducing the leaking illuminating gas into the premises. In the matter before us, it was C–K who introduced the harmful Stain Killer fumes into the indoor atmosphere.

Instructive by analogy to the instant matter is *Baltimore Am. Underwriters of Baltimore Am. Ins. Co. v. Beckley*, 173 Md. 202, 195 A. 550 (1937), a subrogation action by an insurer on a fire loss. The defendant's employees had been working in the living room of the insured's home, using a paste to remove stain and varnish from wood panels. The labels on the cans of paste cautioned in large print, " 'Inflammable. Keep away from fire and use in a well ventilated place.' " *Id.* at 206, 195 A. at 552. The workers had removed the plates from the faces of electrical switch boxes and had unfastened electric wall fixtures which were left hanging by their taped wires. There was evidence that the homeowner had suggested to the workers that they shut off the electricity to the room at the fuse box, but that had not been done. Two and one-half days after the employees began working, a fire suddenly started and badly damaged the living room. *Id.* at 204–06, 195 A. at 551–52. This Court reversed a directed verdict for the defendant and remanded for a new trial.

The subrogated insurer alleged negligence on the part of the defendant in failing properly to ventilate the room and in negligently causing a spark-generating contact with live electrical wiring. *Id.* at 206, 195 A. at 552. The plaintiff apparently had undertaken to prove the lack of sufficient ventilation by evidence interpreting smoke discoloration. On that aspect of the case this Court said that if that evidence were not sufficient "to prove that there was a failure to ventilate the room properly, it is nevertheless a fact that the fire resulted

from the use of instrumentalities which were within the exclusive control of the defendant's employees, and which were applied under conditions requiring special precautions to obviate such a hazard." *Id.* at 207, 195 A. at 552. In other words, the plaintiff could prove indirectly, from the result of the buildup of fumes, that the paste had been applied without sufficient ventilation. With respect to the ignition of the stain remover vapors, this Court said that "any danger of fire which might be supposed to result from an inadvertent shift of the [electrical] switch would have been avoided if the current for that room had been cut off at the fuse box, as suggested to the defendant's representative by the owner of the building." *Id.* at 209, 195 A. at 553.

The instant matter is uncomplicated by the ignition of fumes or vapors. Here, the paint primer fumes themselves are the harmful agent which was applied by C–K "under conditions requiring special precautions to obviate such a hazard," *i.e.,* the hazard against which the Duron Stain Killer label warned. *Id.* at 207, 195 A. at 552.

For these reasons, we affirm.[3]

---

3. Our affirmance includes in the remand for a new trial mandated by the Court of Special Appeals permission for C–K fully to present its case on its cross-claim against S & J.

The Court of Special Appeals concluded that Vito had failed to present sufficient evidence of *respondeat superior* liability on the part of S & J for negligence on the part of Dray. Vito was not sufficiently aggrieved by that holding, adverse to her, to petition for certiorari review.

C–K, in its petition for certiorari and in its briefs to this Court, argues that by scheduling the application of paint primer in the expansion area on a working day for Department employees and by telling Dray to cease applying the paint primer, S & J exercised "control of the actions from which the alleged injury arose." Brief of Appellant at 23.

We interpret C–K's brief in chief and reply brief in this Court to argue that negligence on the part of S & J caused or contributed to Vito's injury. On remand C–K will be free to argue (evidence permitting) that S & J's negligence solely caused the alleged injury, or that S & J's negligence (evidence permitting) operated jointly with negligence on the part of C–K to cause the alleged harm to Vito. This would give rise to a right on the part of C–K to contribution from S & J if both are held liable as joint tortfeasors. We do not interpret C–K's brief to argue for a holding by this Court that the evidence most favorable to Vito was

## JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY THE PETITIONER, COGAN KIBLER, INC.

---

sufficient to support a finding that C–K was the servant of S & J, and we therefore intimate no opinion as to C–K's standing to do so. If C–K were seeking to prove only that S & J was the master and C–K the servant, and if the jury so found, C–K would be liable for indemnity to S & J in the event of a verdict and judgment for the plaintiff against S & J on that ground.