887 A.2d 74

Steven B. TUCKER, Sr., et al.

v.

UNIVERSITY SPECIALTY HOSPITAL.

No. 1396, Sept. Term, 2004.

Court of Special Appeals of Maryland.

Dec. 1, 2005.

Stuart M. Salsbury (Sarah E. Brannon, on the brief), Baltimore, for Appellants.

Lisa J. Russell (Neal M. Brown, on the brief), Lutherville, for Appellee.

Panel: BARBERA, MEREDITH and THEODORE G. BLOOM (Ret'd, Specially Assigned), JJ.

MEREDITH, Judge.

The appellants are the surviving children and parents of Judy Lynch ("the patient" or "Mrs. Lynch"), who died at the age of 53 as a consequence of a lethal overdose of Oxycontin pain medication while Mrs. Lynch was a post-surgical inpatient at University Specialty Hospital ("the hospital"), appellee. In opposition to a motion for summary judgment filed by the hospital, the patient produced expert testimony expressing

an opinion that the patient's death should not have occurred in the absence of negligence on the part of the defendant hospital. The Circuit Court for Baltimore City was not persuaded that the testimony of the patient's experts was sufficient to take the claim of medical negligence to the jury, and entered summary judgment for the hospital. Appellants noted this appeal.

## ISSUES

Appellants present two questions:

I. Did the trial court err in granting summary judgment by not allowing the appellants to rely upon *Meda v. Brown* in establishing legally sufficient evidence of negligence?

II. Did the trial court err in granting summary judgment by not finding legally sufficient evidence to meet the requirement of *res ipsa loquitur?*

Because we conclude that the expert testimony presented by appellants was legally sufficient to take their case to the jury under *Meda v. Brown,* 318 Md. 418, 569 A.2d 202 (1990), we shall vacate the judgment and remand the case for further proceedings. Consequently, we do not need to specifically address the second question raised by the appellants, although we shall observe that our reading of *Meda v. Brown* persuades us that this is not an appropriate case for permitting the jury to infer that the defendant was negligent, by resorting to the doctrine of *res ipsa loquitur,* without the need for expert testimony.

## FACTS

The evidentiary documents and deposition transcripts in the record reflect the following. Having previously undergone surgery at another facility, Mrs. Lynch was admitted to appellee's facility for wound care and rehabilitation on March 13, 2002. During her stay at the appellee hospital, she received multiple prescription medications, including Oxycontin, a narcotic medication used for relief of pain. She died on March 24, 2002, and the cause of her death was a toxic overdose of Oxycontin.

At approximately 7:00 p.m. on March 23, 2002, Alma Ebrado, R.N., came on duty and was assigned to care for Mrs. Lynch. According to Nurse Ebrado's deposition testimony, she administered 20 mg of Oxyfast (a fast acting form of Oxycontin) to Mrs. Lynch at 9:00 p.m., and administered the daily order medications, which included 40 mg of Oxycontin, at 10:00 p.m. Nurse Ebrado also testified that she entered Mrs. Lynch's room at approximately 6:55 a.m. on March 24, 2002, and found the patient to be "sleepy" but "easily arousable."

At 7:00 a.m. on March 24, 2002, Nurse Ebrado's shift ended, and she was relieved by Denise Mosley, R.N. According to Nurse Mosley's deposition testimony, she and Nurse Ebrado physically counted the narcotics assigned to Mrs. Lynch's room and confirmed that no medication was missing. At 7:25 a.m. Nurse Mosley entered Mrs. Lynch's room and found her blue, with frothy secretions coming from her mouth. A "code blue" was called, and Mrs. Lynch was transferred to University of Maryland Medical Center, but despite efforts to resuscitate her, Mrs. Lynch was pronounced dead at 8:20 a.m.

On March 25, 2002, the Medical Examiner's Office for the State of Maryland performed an autopsy. The medical examiner concluded that Mrs. Lynch died of "narcotic intoxication complicating chronic obstructive pulmonary disease." The evidence established—and the parties agree—that Mrs. Lynch died as a result of a lethal dose of Oxycontin.

The deposition testimony of Nurse Mosley included evidence that the hospital's policy was to strictly control and limit access to Oxycontin. The hospital had "protocols ... that there is a certain way that nurses have to treat narcotics in the dispensing of narcotics." The protocols, which were made part of the record, describe the steps that must be taken in administering medications, and state in part:

Check patient's ID band for name and medical record number against MAR/TAR. *Administering nurse must witness medication consumption. Never leave medications unattended at the bedside.*

\* \* \*

Medications *may not be kept at the bedside for self adminis-tration unless ordered by the physician/designee.*

(Emphasis added). Nurse Mosley also testified that the only people supplying Oxycontin to Mrs. Lynch were staff members of the hospital.

Although the hospital suggested it would have been possible for a family member to provide the excess Oxycontin, and noted that there was evidence that one of Mrs. Lynch's daughters had taken Oxycontin many years before her mother's hospitalization, that daughter testified that she had had no access to Oxycontin as of 2002. There was also testimony that no family members were present at the hospital when Mrs. Lynch died. Deposition testimony of the family members reflected that they had last visited Mrs. Lynch two days prior to her death.

Appellants designated two experts—Gary Witman, M.D., and Yale Caplin, Ph.D.—to testify in support of their claim of medical negligence. The deposition testimony of both experts expressed the opinion that the lethal dose of Oxycontin was ingested within approximately one hour of Mrs. Lynch's death. Dr. Witman testified that the lethal concentration of Oxycontin could not have resulted from the dosage of Oxycontin prescribed by Mrs. Lynch's treating physician, stating: "[I]t is impossible that the dose of medication that was prescribed was responsible for the drug levels that this patient had at the time of her death."

Addressing the standard of care issue, Dr. Witman acknowledged that he could not determine specifically how Mrs. Lynch got the lethal dose of Oxycontin, or who administered it, but he nevertheless expressed his opinion that the appellee breached the standard of care it owed to the patient. In this regard, Dr. Witman testified that "the patient was under the exclusive control of hospital personnel at the time of her death, and the type of occurrence in a hospital setting, with a toxic level of a narcotic analgesic, should not occur except in a case of negligence." He further testified:

Q. So you do see violations of the standard of care in this case, you're just not sure who committed them; is that correct?

A. Yes, counsel.

* * *

A. What I stated is that the type of occurrence in a hospital setting, with a toxic level of Oxycodone, which should not occur except if there is negligence.

University Specialty Hospital moved for summary judgment, arguing that appellants' expert testimony was insufficient to make out a prima facie case of negligence under *Meda, supra.* Appellee also contended that Maryland law does not permit recovery under the doctrine of *res ipsa loquitur* in medical malpractice cases. In granting the defendant's motion for summary judgment, the motions judge ruled that *Meda* was not applicable. The motions judge further ruled that appellants were not entitled to have their case submitted to the jury on a *res ipsa loquitur* theory.

## DISCUSSION

Having reviewed in a light most favorable to the non-moving party the documents and transcripts submitted in connection with the motion for summary judgment, we are persuaded that the appellants presented sufficient evidence, including expert testimony, to permit inferences of negligence under the rule enunciated by the Court of Appeals in *Meda.* Because these inferences of negligence were permissible from the evidence in the record, it was inappropriate to enter summary judgment in favor of the hospital.

### Standard of Review

The standard of review when a motion for summary judgment has been granted in favor of the defendant is well settled. As the Court of Appeals stated in *Lee v. Cline,* 384 Md. 245, 248, 863 A.2d 297 (2004) (quoting from *Walk v. Hartford Casualty,* 382 Md. 1, 14, 852 A.2d 98, (2004)), "[w]e review the record in the light most favorable to the non-moving party [here the plaintiff] and construe any reasonable

inferences which may be drawn from the facts against the movant." The procedure is not a substitute for trial, and the motions judge deciding a motion for summary judgment is not to weigh the evidence. *Pittman v. Atlantic Realty Company,* 359 Md. 513, 537–38, 754 A.2d 1030 (2000). Moreover, "all inferences must be resolved against the moving party when determining whether a factual dispute exists, even when the underlying facts are undisputed." *Gross v. Sussex Inc.,* 332 Md. 247, 256, 630 A.2d 1156 (1993).

### A. The requirement of expert testimony in medical malpractice cases.

Because of the complexity of medical malpractice cases, the Court of Appeals has made clear that, in such cases, there ordinarily must be expert testimony to establish breach of the standard of care and causation. *Meda, supra,* 318 Md. at 428, 569 A.2d 202; *Johns Hopkins Hospital v. Genda,* 255 Md. 616, 258 A.2d 595 (1969). This requirement exists because the issues considered in the typical medical malpractice case are generally outside the understanding of ordinary lay people. Although medical malpractice cases may exist in which the breach of duty, injury, and causation are so obvious that expert testimony is not required, such cases are extremely rare, and the case under consideration is clearly not one of them. Without expert testimony, the appellants would have had evidence that a patient died in the hospital, and little else. It was only with the aid of expert testimony that appellants were able to develop evidence as to such things as the cause of death, the fact that the death could not have occurred as a result of the dosages of medication actually prescribed, the magnitude of the overdose necessary to cause death, and the fact that death due to a toxic level of Oxycontin would typically not occur in the hospital setting in the absence of negligence.

### B. *Res ipsa loquitur*—as recognized in Maryland—is not available in cases requiring expert testimony.

*Res ipsa loquitur* (translated as "the thing speaks for itself") simply describes a set of evidentiary conditions that

permit, but do not require, a fact finder to infer negligence based upon proof that certain facts are more probable than not. *Norris v. Ross Stores, Inc.*, 159 Md.App. 323, 329, 859 A.2d 266 (2004). In order to rely upon the doctrine successfully, a plaintiff must present evidence of "(1) a casualty of a kind that does not ordinarily occur absent negligence; (2) that was caused by an instrumentality exclusively in the defendant's control; and (3) that was not caused by an act or omission of the plaintiff." *Holzhauer v. Saks & Co.*, 346 Md. 328, 335–36, 697 A.2d 89 (1997). *See* RESTATEMENT (SECOND) OF TORTS (1965) § 328D; MARYLAND CIVIL PATTERN JURY INSTRUCTIONS, MPJI–Cv 19:8 (4th ed. 2002). If the plaintiff presents evidence as to each of these conditions, and if the jury finds each condition to be more probable than not, the jury may find negligence even in the absence of evidence as to the exact mechanism of injury or the precise manner in which the defendant was negligent. *Meda, supra,* 318 Md. at 425, 569 A.2d 202.

■ But the Court of Appeals has held that the doctrine of *res ipsa loquitur* is not available in cases requiring expert testimony. In *Meda, supra,* a medical malpractice case against an anesthesiologist was tried to a verdict in favor of the plaintiff. The claim arose out of an ulnar nerve injury that manifested immediately after surgery. The plaintiff in *Meda* presented evidence through expert witnesses that the anesthesiologist had a duty to assure that the patient was properly positioned on the operating room table so as to prevent the application of pressure against vulnerable nerves. The plaintiff's experts testified that the probable cause of the nerve injury was compression of the ulnar nerve, though other possible causes could not be totally excluded. *Id.* at 427 n. 2, 569 A.2d 202. Each expert testified that the injury was one that ordinarily would not occur in the absence of negligence. The experts were unable, however, to describe the exact mechanism of the compression injury. They were unable to say, for example, whether the arm had been positioned improperly at the outset, or properly positioned, but improperly secured. Nevertheless, the experts expressed an opinion that

the anesthesiologist breached standards of care in permitting the ulnar nerve injury to occur.

When the case was submitted to the jury, no instruction on *res ipsa loquitur* was given. After a verdict in favor of the plaintiff, the trial judge granted a judgment notwithstanding the verdict, concluding that the opinions of the plaintiff's experts rested, in part, on *res ipsa loquitur,* a doctrine then thought to be completely unavailable in medical malpractice cases.

This Court subsequently reversed, and directed entry of judgment in accordance with the jury's verdict on the ground that the concept of *res ipsa loquitur* was applicable because laymen could properly infer negligence from the happening of an unusual injury to a previously healthy part of the patient's body remote from the surgery site, and because the applicability of *res ipsa loquitur* was further validated by the expert testimony.

Upon further review, the Court of Appeals affirmed *"not on the basis of the applicability of res ipsa loquitur,* but because the testimony was sufficient to support the inferential conclusion of negligence drawn by the plaintiff's experts." *Id.* at 420, 569 A.2d 202 (emphasis added). In this regard, the Court of Appeals held:

Each doctor, based upon his knowledge of the facts and upon his expertise, concluded that Mrs. Brown's injury was one that ordinarily would not have occurred in the absence of negligence on the part of the anesthesiologist. **This inferential reasoning has a familiar ring to it. It is a major part of the concept of *res ipsa loquitur. It is not, however, res ipsa loquitur.* Res ipsa loquitur,* as we now utilize that concept in the law of negligence, means that in an appropriate case the jury will be permitted to infer negligence on the part of the defendant from a showing of facts surrounding the happening of the injury, *unaided by expert testimony,* even though those facts do not show the

mechanism of the injury or the precise manner in which the defendant was negligent.

*Id.* at 425, 569 A.2d 202 (emphasis added).

The Court of Appeals further observed in *Meda* that, "if the plaintiff had offered no expert testimony, but had simply shown the onset of an ulnar nerve injury to her arm following a breast biopsy, the jury would not have been permitted to infer negligence from the facts alone." In other words, *res ipsa loquitur*—as recognized in Maryland—is simply not available in cases that are of such a complex nature that they require expert testimony. *Accord Dover Elevator Co. v. Swann,* 334 Md. 231, 256, 638 A.2d 762 (1994) (holding that expert testimony was required and that *res ipsa loquitur* was therefore not available to prove negligence in a "complex case" involving a malfunctioning elevator and its "complicated inner workings"). *Cf. Orkin v. Holy Cross Hospital,* 318 Md. 429, 433, 569 A.2d 207 (1990) ("Complex issues of the type generated by a case of this kind [*i.e.,* complicated medical issues] should not be resolved by laymen without expert assistance. *Res ipsa loquitur* does not apply under these circumstances.").

### C. Expert Witnesses are permitted to use inferential reasoning in reaching and expressing their opinions.

Although a jury is not permitted to apply a *res ipsa* analysis to infer negligence, unaided by expert testimony, in a complex case, the Court of Appeals made clear in *Meda* that a qualified expert may use inferential reasoning in reaching the expert's opinions and conclusions. In other words, in cases requiring expert testimony, experts may testify not only to their understanding of the facts and circumstances, but they may also use their knowledge, training, and experience to draw inferences from those facts and circumstances. And the fact that an expert is unable to identify the specific act of negligence or the precise mechanism of injury does not preclude that expert from drawing an inference of negligence from the circumstances. *Meda, supra,* 318 Md. at 427–28, 569 A.2d 202. Such an inference may be drawn because " '[n]egligence, like any other fact, can be established by the proof of

circumstances from which its existence may be inferred.' *Western Md. R. Co. v. Shivers,* 101 Md. 391, 393, 61 A. 618 (1905)." *Id.*

In *Kennelly v. Burgess,* 337 Md. 562, 578, 654 A.2d 1335 (1995), the Court of Appeals made reference to *Meda's* holding that an expert might "use the fact of an unsuccessful result in medical treatment as a basis for an opinion that the physician was negligent," and stated: "As we held in *Meda,* [318 Md. at 428, 569 A.2d 202,] an expert, as distinguished from a mere lay witness, may, in appropriate circumstances, rely on an unsuccessful result in concluding that a physician was negligent."

As the Court of Appeals explained in *Dover, supra,* 334 Md. at 254, 638 A.2d 762 (italics in original, boldface added):

If expert testimony is used to raise an inference that the accident could not happen had there been no negligence, then it is the expert witness, not an application of the traditional *res ipsa loquitur* doctrine, that raises the inference. The expert testimony offered in these "quasi *res ipsa loquitur* cases" differs somewhat from more traditional expert testimony because, instead of testifying that a *particular act* or omission constituted a failure to exercise due care, the expert testifies to the *probability* that the injury was caused by the failure to exercise due care. *See Meda,* 318 Md. at 428, 569 A.2d at 207. The expert also testifies that the accident ordinarily would not occur unless there was a failure to exercise the appropriate degree of care. Like a *res ipsa loquitur* case, such expert testimony is offered to explain why there is a probability of negligence, which may be inferred from the circumstances of the accident, even though the expert is unable to pinpoint any particular negligent conduct. **Although such testimony does not isolate the specific negligent conduct, it does allow the jury to find negligence as the result of the expert's opinion rather than by circumstantial evidence and common knowledge as in the usual *res ipsa loquitur* case.**

**D. The expert testimony in this case was sufficient to survive the defendant's motion for summary judgment.**

 As the authorities quoted above indicate, the appellants in this case could not prove their claim of professional negligence on a pure *res ipsa loquitur* theory. Under the principles set forth by the Court of Appeals in *Meda*, however, appellants were entitled to rely on the inferential reasoning of their experts to establish the negligence of the hospital's staff. And appellants were entitled to rely on this inferential reasoning despite their experts' inability to identify the specific act of negligence or the precise mechanism of injury. *Dover, supra,* 334 Md. at 254, 638 A.2d 762.

With these principles in mind, we must examine whether the evidence before the motions court—including the expert testimony—was sufficient to generate disputes of material fact that made summary judgment on the issue of liability inappropriate. We focus on the testimony of Dr. Witman, the expert who expressed the inferential opinion that Mrs. Lynch's death occurred as a consequence of appellee's negligence. Dr. Witman clearly testified at his deposition that Mrs. Lynch's death due to narcotic intoxication is the kind of event that does not occur absent negligence in the in-patient hospital setting. Dr. Witman also testified that it was his opinion that Mrs. Lynch's death resulted from a breach in the standard of care on the part of the hospital's staff. Dr. Witman based his opinions on his familiarity with the in-patient hospital setting, and, in particular, with the way controlled dangerous substances are—or, in the exercise of reasonable care, should be—prescribed, dispensed, and monitored.

 Not surprisingly, the hospital disputes the inferences and conclusions drawn by Dr. Witman. But when a court considers a motion for summary judgment, all reasonable or permissible inferences must be resolved in favor of the nonmoving party. *Goodwich v. Sinai Hospital of Baltimore,* 343 Md. 185, 207, 680 A.2d 1067 (1996). The moving party is not entitled to judgment as a matter of law when reasonable

inferences deducible from the facts are sufficient to permit the trier of fact to arrive at more than one conclusion. *Id.*

The issue then is whether the inferences drawn by Dr. Witman from the available facts were "reasonable" or "permissible." Dr. Witman explained that Mrs. Lynch died as a result of a lethal dose of narcotic medication that was far greater than that which had been prescribed by her attending physician. The evidence was that narcotic medications are, or should be, kept under lock and key in the in-patient setting. The evidence was that the hospital's staff was responsible for counting out and administering narcotic medications in strict accordance with physicians' orders.

The evidence clearly established that the hospital's staff had access to the specific medication that caused Mrs. Lynch's death, and further, that it was undisputed that the hospital's staff had been administering the specific medication to Mrs. Lynch in a variety of formulations and dosages over a period of eleven days. The evidence also reflected that the hospital staff administered Oxycontin to Mrs. Lynch on some occasions by placing the medication directly in the patient's gastric feeding tube. The information available to Dr. Witman was that the hospital's staff was the *only* known supplier of narcotic medications to Mrs. Lynch in the time frame prior to her death. The evidence available to Dr. Witman was that neither Mrs. Lynch, nor any other non-staff member, had access to the hospital's supply of narcotic medications. Dr. Witman observed that there was no evidence that Mrs. Lynch, who was very ill and confined to her bed, had contributed to her own death by somehow procuring and consuming narcotic medications in addition to the medication provided by hospital staff. Given these facts and circumstances, we cannot say, as a matter of law, that Dr. Witman's opinion (that Mrs. Lynch's death was more likely than not the result of negligence on the part of the hospital's staff) was an "unreasonable" or "impermissible" inference for him to draw as an expert witness.

■ The hospital suggests that the inference of negligence drawn by Dr. Witman was "impermissible" as a matter of law

because the appellants did not establish that appellee was in "exclusive control" of the situation at the time of the overdose, and did not exclude the possibility that Mrs. Lynch was responsible for her own death. In essence, the hospital contends that any inferential expert opinion offered by the appellants is, as a matter of law, insufficient to support a finding of professional negligence unless the facts underlying the expert opinion meet the three-pronged *res ipsa loquitur* test, *viz.*, (1) a casualty that does not usually occur in the absence of negligence, (2) caused by an instrumentality within the exclusive control of the defendant, (3) under circumstances indicating that the casualty did not result from the act or omission of the plaintiff. *Meda*, 318 Md. at 423, 569 A.2d 202. To resolve this appeal, however, we need not decide whether the hospital is correct that *Meda* specifically requires such evidence, because, even assuming *arguendo* that such foundation evidence is required, we are satisfied that the evidence supporting Dr. Witman's opinions was sufficient to satisfy, by a preponderance-of-the-evidence standard, all three prongs of the *res ipsa loquitur* test.

Appellee argues that there was insufficient proof of "exclusive control" because (1) Mrs. Lynch's hospital room was "open and accessible" to persons other than hospital staff; (2) Mrs. Lynch was conscious at 6:55 a.m., when reportedly last seen by a member of the hospital staff, approximately one hour before the patient's death; and (3) Mrs. Lynch's daughter "at some point in her past ... was prescribed and used Oxycontin for headache." The short answer to appellee's highly speculative arguments that someone other than a member of the hospital staff theoretically could have gained access to the excess Oxycontin and caused the lethal overdose, is that it is for the jury, not the court, to determine whether the suggestion of such a possible alternative will overcome the conclusions drawn and opinions expressed by Dr. Witman. That Mrs. Lynch received a lethal overdose of a carefully monitored and strictly controlled narcotic pain medication at a time when she was very ill and confined to bed in the appellee's facility is sufficient evidence of "control" to permit

Dr. Witman's inference that the hospital was "probably" responsible. Under *Meda*, this is all that is necessary to take the case to the jury.

For the same reason, Dr. Witman's opinion as to the hospital staff's negligence is not overcome, at the summary judgment stage, by the hospital's hypothesis that Mrs. Lynch might have caused her own death. The hospital argues that the evidence did not exclude that possibility. In this regard, appellee speculates—without any specific evidentiary support—that Mrs. Lynch may have hoarded doses of Oxycontin dispensed by the hospital's staff over the days before her death, and "self medicated" with a massive dose on the morning of her death. But this theoretical possibility would not negate potential liability on the part of the hospital for violating its own protocol regarding dispensing the hoarded medication. The evidence in the record indicated that the hospital's medication protocol required that the "administering nurse must witness consumption" of all medication, and that the nursing staff should "never leave medications unattended at the bedside." Consequently, even if there was any evidence in the record that Mrs. Lynch hoarded Oxycontin for several days (and we note that the evidence in the record was arguably much more supportive of a conclusion to the contrary), such evidence would provide support for an alternative, albeit specific, theory of negligence, rather than support for the entry of summary judgment in favor of the hospital. The evidence available to Dr. Witman was that Mrs. Lynch was bedridden, and had no access to narcotic medications except to the extent that access was provided by the hospital's staff. This evidence was sufficient to support an inference at the summary judgment stage that Mrs. Lynch was probably not responsible for her own death.

■ Moreover, even in traditional *res ipsa loquitur* cases—in which juries are permitted to infer negligence unaided by expert testimony—evidence of total and complete control of the instrumentality of harm is not required. As the Court of Appeals stated in *Leidenfrost v. Atlantic Masonry,*

*Inc.,* 235 Md. 244, 250, 201 A.2d 336 (1964), the exclusive-control requirement "may be established by evidence sufficient to warrant an inference of its existence, and circumstantial evidence may suffice. The plaintiff is not required in his proof to exclude remotely possible causes and reduce the question of control to a scientific certainty." *Accord Norris v. Ross Stores, Inc.,* 159 Md.App. 323, 332–33, 859 A.2d 266 (2004).

In summary, the appellants presented expert testimony that Mrs. Lynch's death resulted from negligence on the part of the hospital staff. The expert testimony, which was based upon reasonable inferences drawn from the available evidence, was sufficient to establish that the hospital was not entitled to judgment in its favor as a matter of law. The weight to be given to that testimony is for the jury.

**JUDGMENT VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**