**HEADNOTE:**     *The Retina Group of Washington, Inc. v. Gustavo Crosetto*
        No. 2385, Sept. Term 2016

**MEDICAL MALPRACTICE—CERTIFICATE OF QUALIFIED EXPERT—RESPONDEAT SUPERIOR LIABILITY OF HEALTH CARE PROVIDER PRINCIPAL BASED ON NEGLIGENCE OF AGENT—AGENT MUST BE IDENTIFIED AND AGENT'S BREACH OF THE STANDARD OF CARE MUST BE IDENTIFIED IN CERTIFICATE.**

Mr. Crosetto was examined by Dr. Desai, a retinal surgeon who is a member of The Retina Group of Washington ("RGW"). Dr. Desai diagnosed a large retinal tear in the left eye that needed prompt repair. At the time of that examination, Mr. Crosetto had an elevated intraocular pressure ("IOP") in the left eye. The repair was performed two days later by Dr. Sanders, another retinal surgeon with RGW. The repair was performed at the Friendship Ambulatory Care Center ("FASC"). There is no evidence that FASC and RGW are related entities. Dr. Sanders sutured the tear and inserted a 20% C3F8 gas tamponade in the vitreous humor to hold the repair in place. The gas bubble would dissipate over a period of weeks. After the surgery was completed, Mr. Crosetto was kept in the recovery room for 45 minutes and then was discharged to home. In follow up visits, he could not see out of his left eye, except for dark and light. Eventually he was diagnosed as having suffered atrophy to the optic nerve of that eye.

In the Health Care Alternative Dispute Resolution Office, Mr. Crosetto and his wife brought a claim for medical negligence against RGW and Dr. Sanders. They filed a certificate of qualified expert and report by Dr. Josephberg who stated that Dr. Sanders breached the standard of care by using the 20% C3F8 gas tamponade, instead of a different gas, and not monitoring the IOP before and after surgery; and that his negligence proximately caused the loss of vision in Mr. Crosetto's left eye. The certificate did not identify any other agent of RGW as having breached the standard of care. The Crosettos unilaterally waived out of arbitration and into circuit court.

After discovery was completed, the Crosettos filed a supplemental certificate of qualified expert, pursuant to section 3-2A-06D of the Courts and Judicial Proceedings Article, also by Dr. Josephberg, that only identified Dr. Sanders as having breached the standard of care. In their joint pretrial statement, they only identified Dr. Sanders as having breached the standard of care. A few weeks before trial, they filed an amended complaint that alleged that Mr. Crosetto's elevated IOP should have been treated with drops prior to surgery. The amended complaint did not identify any health care provider alleged to have acted negligently other than Dr. Sanders.

Soon before trial, the parties met with the assigned trial judge and discussed, among other things, a verdict sheet to be used. The Crosettos proposed a verdict sheet that would allow the jurors to decide the liability of RGW separately from the liability of

Dr. Sanders. Counsel for RGW objected on the ground that RGW's alleged liability was based solely on respondeat superior, and Dr. Sanders was the only agent of RGW identified in the certificates of qualified expert as having breached the standard of care. The court denied the objection and accepted the verdict sheet as proposed by the Crosettos.

At trial, Dr. Josephberg criticized Dr. Desai for not having treated the elevated IOP prior to surgery, although he did not opine to a reasonable degree of medical certainty that Dr. Desai breached the standard of care. He testified that Dr. Sanders breached the standard of care by not treating the IOP and by using the 20% C3F8 gas tamponade. He testified that it was a breach of the standard of care for Mr. Crosetto not to have been monitored for six to eight hours after surgery. At the close of the evidence, RGW moved for judgment to the extent that any liability it might incur would be based on actions or omissions of its agents other than Dr. Sanders.

Using the special verdict sheet that RGW had objected to, the jury returned a verdict answering "no" to the question whether Dr. Sanders breached the standard of care and "yes" to the question whether RGW "by and through any one of its agents (excluding Defendant [Dr. Sanders]) negligently failed to follow one or more standards of care owed to [Mr. Crosetto] before, on, or after the [date of the surgery]." They further found that the violation of the standard of care "by the agents and employees of [RGW] was a proximate cause of the injury to [Mr. Crosetto]" and awarded damages. RGW filed a motion for JNOV, which was denied.

*Held*: Judgment in favor of the Crosettos and against RGW reversed. RGW's alleged liability was predicated solely on respondeat superior. There was no evidence of independent negligence, and the jury was asked to decide liability based on respondeat superior. For a defendant health care provider to be liable for medical negligence based on respondeat superior, *i.e.*, for being the principal of an agent health care provider, the plaintiff's certificate of qualified expert must identify the agent, specify the standard of care applicable to the agent, specify that the standard of care was breached, and state that the breach proximately caused the plaintiff's injury. Here, the only agent of RGW identified in the Crosettos' two certificates of qualified expert as having breached the standard of care was Dr. Sanders. No other agent of RGW, including Dr. Desai, was identified. Accordingly, RGW only could be found liable based on the negligence of Dr. Sanders. Because the jury found that Dr. Sanders did not breach the standard of care in his treatment of Mr. Crosetto, RGW could not be found liable. In addition, the evidence at trial was legally insufficient to support a finding of negligence on the part of any health care provider other than Dr. Sanders.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2385

September Term, 2016

_____

THE RETINA GROUP OF
WASHINGTON, P.C.

v.

GUSTAVO CROSETTO, ET UX.

_____

Woodward, C.J.,
Eyler, Deborah S.,
Fader,

JJ.
_____

Opinion by Eyler, Deborah S., J.
_____

Filed: April 27, 2018

In the Health Care Alternative Dispute Resolution Office ("HCADRO"), Gustavo and Cristina Crosetto filed suit for medical malpractice against Reginald Sanders, M.D., and The Retina Group of Washington, P.C. ("RGW"), in which Dr. Sanders has an ownership interest. The complaint alleged that at the relevant time Dr. Sanders was acting as an agent of RGW and within the scope of the agency. After the Crosettos filed a certificate of qualified expert attesting that Dr. Sanders deviated from the requisite standard of care in treating Mr. Crosetto, causing the alleged injury, they unilaterally waived arbitration, pursuing their claims against Dr. Sanders and RGW in the Circuit Court for Montgomery County.

Before trial, RGW objected to a proposed verdict sheet that would permit separate verdicts to be returned as to it and Dr. Sanders. RGW argued that any liability it might have would be coextensive with that of Dr. Sanders, because the Crosettos' certificate of qualified expert only identified Dr. Sanders, and no other agent of RGW, as having breached the standard of care. The court overruled RGW's objection.

The case went to trial before a jury. RGW moved for judgment, which the court denied. The jury returned a verdict in favor of Dr. Sanders but against RGW for the medical negligence of "any one of [RGW's] agents (excluding Defendant [Dr. Sanders])." RGW moved for judgment notwithstanding the verdict ("JNOV") on the ground that the Crosettos did not identify, before or during trial, any agent of RGW who deviated from the standard of care, other than Dr. Sanders. The court denied the motion.

RGW noted this appeal, presenting two questions, which we have rephrased as follows:

I. Did the trial court err by allowing the Crosettos to pursue a claim against RGW for the medical negligence of any agent other than Dr. Sanders?

II. Was there legally sufficient evidence to support the jury's verdict that an agent of RGW, other than Dr. Sanders, was negligent?

We find error as to both issues and shall reverse the judgment against RGW.

**FACTS AND PROCEEDINGS**

On December 2, 2014, Mr. Crosetto went to his ophthalmologist, Amy Green-Simms, M.D., complaining of "shade" and "flashes" affecting the vision in his left eye. Dr. Green-Simms referred Mr. Crosetto to RGW, where, that same day, he met with Vinay Desai, M.D., an ophthalmologist who specializes in retinal disease. Dr. Desai diagnosed Mr. Crosetto with a "giant retinal tear" in the left eye and told him that the tear needed to be surgically repaired promptly.

During the December 2, 2014 examination, the intraocular pressure ("IOP") in Mr. Crosetto's left eye was determined to be 28 mmHg by Tono-Pen and 29 mmHg by slit-lamp. The normal range for IOP is between 10 and 22 mmHg. Dr. Desai did not prescribe pressure-lowering medication for Mr. Crosetto to take before surgery. In Dr. Desai's view, Mr. Crosetto's IOP was temporarily elevated due to the dilation drops he had been given earlier that day.

Because Dr. Desai's schedule did not permit him to perform the surgery, he contacted Dr. Sanders, a vitreoretinal surgeon with RGW, who agreed to do so. Dr. Desai transmitted his documentation of Mr. Crosetto's December 2, 2014 office visit to Dr. Sanders the same day. Dr. Sanders operated on Mr. Crosetto two days later, on December 4, 2014, at the Friendship Ambulatory Surgery Center ("FASC"). David

Warrow, M.D., a retina fellow with RGW, was present and observed. Dr. Sanders first saw Mr. Crosetto on the morning of the surgery. He did not measure Mr. Crosetto's IOP at that time.

The surgery was performed in two phases. First, Dr. Sanders attached a scleral buckle to Mr. Crosetto's left eye and sutured the tear in the retina. Next, Dr. Sanders performed a vitrectomy to replace the vitreous humor in the eye with a gas bubble that would hold the retina in place, giving it time to heal. Specifically, Dr. Sanders filled Mr. Crosetto's eye with a 20% C3F8 gas tamponade. C3F8 gas at a 20% concentration expands post-operatively before dissipating over time.

During the surgery, the IOP in Mr. Crosetto's left eye was controlled mechanically. At the end of the procedure, Dr. Sanders administered Diamox, which lowers fluid production in the eye and therefore lowers the IOP. Before closing up, Dr. Sanders used his finger to measure Mr. Crosetto's IOP and noted that it was "normal." At the conclusion of the surgery, Mr. Crosetto's left eye was bandaged and patched, which was routine. The surgery was completed at 10:15 a.m. After spending 45 minutes in the recovery room, Mr. Crosetto was discharged to home, at 11:00 a.m. At that time, he "was still feeling a lot of pressure in [his] eye." Between the end of surgery and Mr. Crosetto's release, Dr. Sanders did not check Mr. Crosetto's IOP.

The next day, December 5, 2014, Mr. Crosetto attended a follow-up appointment with Dr. Desai. Mr. Crosetto reported that he could not see out of his left eye. Dr. Desai told him that it was normal not to regain vision so soon after the operation and that the gas bubble was affecting his vision but would "disintegrate in four to six weeks." Dr.

Desai measured Mr. Crosetto's IOP, which was 38 mmHg. He was not concerned about the increase in IOP because a significant increase in pressure would have been accompanied by uncontrollable pain, and Mr. Crosetto had been able to manage his pain with Tylenol.

On December 6, 2014, Mr. Crosetto returned to RGW and met with Dr. Warrow. He still could not see out of his left eye and was continuing to feel pressure. Dr. Warrow measured Mr. Crosetto's IOP and obtained a reading of 32 mmHg. Dr. Warrow prescribed Diamox to help control the IOP.

On December 10, 2014, Mr. Crosetto went to a follow-up appointment with Dr. Desai. At that time, the IOP in his left eye was 20 mmHg. Mr. Crosetto reported that he still could not see out of his left eye. Dr. Desai reassured him that he was "doing well" and that the surgery had been successful. He told Mr. Crosetto that he would regain his vision after the gas bubble dissipated.

Mr. Crosetto's next follow-up visit was on January 23, 2015, with Dr. Desai. Mr. Crosetto told Dr. Desai that he only could detect light out of his left eye. Dr. Desai referred him to Martin Kolsky, M.D., a neuro-ophthalmologist. Dr. Kolsky diagnosed Mr. Crosetto with an atrophic optic nerve. Dr. Kolsky ruled out causes such as a hemorrhage, mass, or stroke, and concluded that the nerve atrophy may have resulted from ischemia, *i.e.*, loss of blood flow to the optic nerve. Mr. Crosetto never regained vision in his left eye.

On September 4, 2015, in the HCADRO, Mr. Crosetto and his wife filed a complaint against Dr. Sanders and RGW for medical negligence and loss of consortium.

They alleged that Dr. Sanders was acting as RGW's agent at the relevant times. According to the complaint,

> the Defendants breach[ed] one or more applicable standards of medical care . . . by . . . failing to prescribe and administer a safe dosage of a gas tamponade C3F8 that was safely under the 20% level [and by failing to] properly and timely monitor[] Mr. Crosetto's eye pressure before, during and after the Surgery . . . .

The Crosettos identified FASC and alleged that Susan Hanwell, M.D., an agent of FASC, served as the anesthesiologist during the operation. They also alleged that "the Defendants employed various medical providers and medical staff at its place of business to provide medical treatment to Mr. Crosetto" and "[t]he Defendants were all acting within the scope of their respective employment when they rendered medical care . . . ."

The complaint was accompanied by a certificate of qualified expert and report by Robert Josephberg, M.D., an ophthalmologist who specializes in retinal disease. In his certificate and report, Dr. Josephberg opined that 20% C3F8 gas expands in the eye and "elevate[s] pressure to act as a 'tourniquet' that severely limits the blood supply to the eye." He asserted that Dr. Sanders breached the standard of care by administering a 20% C3F8 gas tamponade to Mr. Crosetto and by failing to monitor Mr. Crosetto's IOP before and after surgery. He asserted that "the breach of one or more standards of care by Dr. Reginald Sanders caused the permanent loss of vision in Mr. Crosetto's left eye." Dr. Josephberg identified Dr. Warrow and Dr. Hanwell as part of the "team" of doctors caring for Mr. Crosetto, but did not state that either of them, or anyone other than Dr. Sanders, breached the standard of care.

On September 22, 2015, the Crosettos unilaterally waived arbitration in the HCADRO pursuant to Md. Code (1974, 2013 Repl. Vol.), section 3-2A-06B of the Courts and Judicial Proceedings Article ("CJP"), and on September 28, 2015, they filed their complaint in the Circuit Court for Montgomery County. They filed an amended complaint on July 7, 2016. That complaint removed all references to FASC and Dr. Hanwell.[1]

Discovery closed on August 15, 2016. On August 23, 2016, the parties filed a Joint Pretrial Statement. Under "Nature of the Case," counsel for the Crosettos wrote:

> The Plaintiffs, as husband and wife, bring this medical malpractice claim in four counts alleging, *inter alia*, simply that the Defendant retina surgeon breached the standard of care by neglecting to review and/or consider the patient's pre-existing medical conditions that made him vulnerable to the Defendant surgeon's use of an excessive and dangerous level of a 20% gas/air tamponade perfluoropropane (C3F8) that expanded to up to four times it's [sic] volume. These negligent acts allegedly caused suffocation of the Plaintiff's central retinal artery to his left eye's optic nerve resulting in permanent loss of vision.

In another section of the Joint Pretrial Statement entitled "Claims and/or Defenses," counsel for the Crosettos referred only to allegedly negligent acts and omissions by the "surgeon Defendant," clearly referring to Dr. Sanders.

On August 26, 2016, the Crosettos filed a supplemental certificate of qualified expert and report by Dr. Josephberg, as required by CJP section 3-2A-06D. The supplemental certificate and report was substantively similar to the initial certificate and

---

[1] Neither FASC nor Dr. Hanwell had been named as defendants in the complaint filed in the HCADRO or the circuit court.

report. It eliminated the prior references to Drs. Warrow and Hanwell, however, and added a sentence stating, somewhat cryptically, "[t]hat after [s]urgery Dr. Sanders or RGW failed to monitor Mr. Crosetto . . . and failed to measure the IOP and follow-up with care by prematurely discharging him[.]" Other than Dr. Sanders, Dr. Josephberg did not identify any agent of RGW who breached the standard of care.

The case was set for a jury trial to begin on November 28, 2016. On October 11, 2016, the Crosettos filed a second amended complaint. They alleged for the first time that agents of RGW were negligent by failing to "prescrib[e] and administer[] eye pressure lowering drops on and after December 2, 2014 through [s]urgery[.]" No person other than Dr. Sanders was alleged to have breached the standard of care, however.

On November 15, 2016, the court held a hearing on preliminary matters, including proposed jury instructions and verdict sheets. RGW objected to a proposed verdict sheet that posed separate liability questions for Dr. Sanders and RGW. RGW argued that there was no claim of negligence on the part of any agent of RGW other than Dr. Sanders. Therefore, its only liability would be for the negligence of Dr. Sanders, if any.

The Crosettos countered that RGW could be held vicariously liable for Dr. Sanders's negligence and for the negligence of its agents other than Dr. Sanders. Specifically:

> Doctor Sanders did the surgery, and the gravamen of the case clearly is a 20 percent versus 15 percent [concentration of C3F8 gas]. That's why he's a defendant. [A]lso, his employer [RGW] is a defendant because his partner[], Doctor Des[a]i, pre-op saw Mr. Crosetto and did not give him pressure lowering [medication]. So he's an agent of the corporation. That's not Doctor Sanders['s] conduct.

The court ruled that the Crosettos could pursue a claim against RGW for the negligence of its agents in addition to Dr. Sanders, saying, "at this point, I think we'll ask the jury if anybody else committed negligence[.]" The court reasoned that that theory of negligence "was out there and [RGW] could have explored it in discovery[.]"[2]

The trial began as scheduled, on November 28, 2016. In opening statement, counsel for the Crosettos said:

> [W]e also contend that on December 2nd . . . Dr. Desai who's a partner at RGW and is a defendant,[3] did not prescribe pressure lowering drops. In other words, the plaintiffs contend that if somebody has high eye blood pressure and they're going into surgery two days later; give them medication to lower the pressure.

Dr. Josephberg was the Crosettos' sole liability expert at trial. He criticized Dr. Desai, stating that an IOP of 29 mmHg "should have been pre-treated [before surgery]." He observed that "29 pressure was definitely something that should have been treated by

---

[2] When counsel for RGW complained that during discovery he had not been able to ask Dr. Josephberg which agents of RGW, other than Dr. Sanders, breached the standard of care, as there had been no such allegation or certification, the court responded that he would have two weeks to take Dr. Josephberg's deposition (again). Counsel for the Crosettos said he was unavailable for the next week, and counsel for RGW complained about having to go to New York, Dr. Josephberg's location, during Thanksgiving. (The trial date was the Monday after Thanksgiving.) That topic of discussion was brought to an end when the court announced that breaches of the standard of care by agents other than Dr. Sanders were "out there" and counsel "could have explored it in discovery[.]"

[3] Dr. Desai was not a defendant in the case. After opening statement, outside the presence of the jury, defense counsel objected to plaintiff's counsel's stating that Dr. Desai was a defendant and asked the court for a curative instruction or, in the alternative, a mistrial. The court did not grant that relief but told defense counsel to "neither dwell on that [nor] emphasize that. But from henceforth, let's just call Dr. Desai Dr. Desai period."

I'd say 98 percent of specialists." However, he did not offer an opinion to a reasonable degree of medical certainty that Dr. Desai breached the standard of care by not prescribing eye pressure-lowering medication prior to surgery. (Nor did he opine that any such failure caused Mr. Crosetto's optic nerve to atrophy.)

Dr. Josephberg's testimony focused on Dr. Sanders. He opined that because a 20% C3F8 gas tamponade has expansive qualities, it should not have been used because Mr. Crosetto had an elevated IOP two days before surgery. He testified that he personally would have used a 14% C3F8 gas tamponade because the gas does not expand at that percentage. He further stated, "if you're going to use 20 percent you better have a good reason[,]" and "if you're going to put an expanding bubble in, you better monitor it even under normal circumstances for the first five to eight hours after the case and make sure the pressure doesn't spike." Dr. Josephberg opined that this was necessary "[b]ecause the maximum expansion [of 20% C3F8] is in four to eight hours" and lack of blood flow to the optic nerve for only 60 minutes will cause permanent damage. He concluded that Dr. Sanders breached the standard of care by discharging Mr. Crosetto 45 minutes after surgery instead of monitoring him for "six to eight hours" to watch for a spike in IOP.

When counsel for the Crosettos questioned Dr. Josephberg about whether RGW and Dr. Sanders violated the standard of care, the following exchange occurred:

Q      Do you have an opinion based upon a reasonable degree of medical certainty, your training and clinical experience as to whether the 20 percent gas injected by Dr. Sanders during the December 4th surgery expanded in the eye and further elevated his eye pressure causing an arterial occlusion or any other defect that caused his loss of vision?

A     Yes.  I do.

Q     And what is that opinion?

A     That the 20 percent expanded and caused the damage to the optic nerve.

. . .

Q     Doctor, do you have an opinion based upon a reasonable degree of medical certainty as to whether RGW violated the standard of care as to Mr. Crosetto by not adequately monitoring his eye pressure?

. . .

A     Yes.  I do.

Q     What is that opinion?

A     They violated the standard of care[.]

Q     How so?

A     By not monitoring for five to ten hours.

Q     Do you have an opinion based upon a reasonable degree of medical certainty as to whether Dr. Sanders violated the standard of care as to Mr. Crosetto by not adequately monitoring his eye pressure after his surgery on December 4th?

A     Yes.  I do.

Q     And what is that opinion?

A     That he violated the standard of care.

Q     And do you have an opinion based upon a reasonable degree of medical certainty as to whether RGW's failure to monitor the standard of care caused Mr. Crosetto's loss of vision?

       [RGW's Counsel]: Objection.

       THE COURT: I'm sorry.  Repeat the question?

-10-

. . .

Q	Do you have an opinion based upon a reasonable degree of medical certainty as to whether RGW's failure to monitor Mr. Crosetto post-surgery caused his loss of vision?

[RGW's Counsel]: Objection.

THE COURT: What I assume by the question for the Doctor's assumption is that the employees are agents of RGW when you say that?

[Crosettos' Counsel]: Yes, sir.

THE COURT: Is that right?

[Crosettos' Counsel]: Yes, sir.

THE COURT: All right.  For the previous reasons stated, I'll permit the question.

. . .

A	Basically all I could state -- I'm not sure of the employer relationship here.

. . .

Q	Doctor, do you have an opinion?

A	Yes.

Q	Okay.  And what is that opinion?

A	*If Dr. Sanders is an employee of RGW then they would violate the standard of care.*

(Emphasis added.)

Dr. Josephberg testified that Mr. Crosetto lost the vision in his left eye because there was an insult to his optic nerve that resulted in atrophy.  He opined that the insult

happened within the first ten-to-fifteen hours after the surgery. In other words, the damage was done before the December 5, 2014 office visit.[4]

Dr. Josephberg did not testify that Dr. Warrow breached the standard of care. Nor did he identify any agent of RGW, other than Dr. Sanders, who breached the standard of care during or after Mr. Crosetto's December 4, 2014 surgery.

RGW moved for judgment "with respect to any claims of breach of the standard of care on the part of Dr. Desai, or any other member of [RGW], other than Dr. Sanders." Its counsel argued that a claim against Dr. Desai "was never certified in Health Claims" and there was "no factual foundation in this record whatsoever that anybody from [RGW], other than Dr. Sanders, was involved in the discharge of Mr. Crosetto from" the surgery center.[5] The trial court denied the motion.

After the defense case, counsel for RGW again moved for judgment, on the same grounds.[6] Closing arguments were presented, and the jurors were sent to deliberate.

---

[4] At one point in his testimony, Dr. Josephberg opined that the injury happened immediately after the surgery.

[5] RGW was "willing to stipulate . . . that at all times relevant to his care and treatment of Mr. Crosetto, Dr. Sanders was an employee of [RGW], acting within the scope of his employment[.]" The Crosettos did not accept that stipulation.

[6] In the defense case, expert witness Alan Palestine, M.D., a retinal surgeon, testified that Dr. Sanders complied with the standard of care. He explained that Mr. Crosetto's elevated IOP two days prior to surgery did not require treatment. The IOP at Dr. Green-Simms's office was 15, and only went up after the patient's eye was dilated, which is normal. The use of 20% C3F8 gas was proper and no standard of care required a surgeon to monitor the IOP after the patient had left the operating room. The eye is patched after surgery and is never unpatched in the recovery room, where the patient is

(Continued…)

Using the special verdict sheet to which RGW objected, the jurors answered "no" to whether Dr. Sanders deviated from the standard of care but answered "yes" to whether RGW "by and through any one of its agents (excluding Defendant [Dr. Sanders]) negligently failed to follow one or more standards of care owed to [Mr. Crosetto] before, on, or after the December 4, 2014, date of surgery." The jurors further found that "the violation of the standard of care by the agents and employees of [RGW] was a proximate cause of the injury to [Mr. Crosetto]." The jurors awarded $500,000 in damages to Mr. Crosetto and $500,000 in damages to the Crosettos for loss of consortium. Ultimately, the damages award was reduced from $1,000,000 to $740,000 pursuant to the applicable cap on non-economic damages.

RGW filed a timely motion for JNOV, making the same arguments it had made in moving for judgment: 1) that the jury should not have been asked to decide the alleged negligence of any agent of RGW other than Dr. Sanders because no other agent was identified in either of Dr. Josephberg's certificates of qualified expert, and 2) that the

---

(...continued)

recovering from the effects of the anesthesia. Indeed, it would be a breach of the standard of care for a surgeon to ask a worker in the recovery room or surgical center to monitor a patient's IOP. Dr. Sanders administered Diamox at the end of the surgery, which takes care of the IOP for the first twelve hours after surgery and is more effective than drops. The IOP of 38 on the first post-op day was "fairly normal." There was no evidence that the eye was overfilled with gas or of a spike in the IOP after surgery.

Dr. Palestine explained that ischemic neuropathy happens when "the optic nerve is damaged by interference of blood flow of the small vessels that . . . profuse [sic] the optic nerve." It is a "well-documented" but "very uncommon" complication of this type of surgery that is "not related to eye pressure. . . . [or] to any definable factors that we know." It is "a mini stroke" in the optic nerve that damages it, sometimes permanently and sometimes not.

evidence was legally insufficient to prove that an agent of RGW other than Dr. Sanders breached the standard of care. On January 5, 2017, the trial court denied the motion, opining that "there was ample notice" to RGW that it "was and became an independent defendant," and that RGW was "perfectly able to flush out if there was any specific allegation in a much greater detail" itself. This timely appeal followed.

## DISCUSSION

### I.

RGW contends the trial court erred by ruling that the Crosettos could pursue a medical negligence claim against it based on alleged breaches of the standard of care by one of its agents other than Dr. Sanders because Dr. Sanders was the only agent of RGW that Dr. Josephberg certified as having breached the standard of care.

The Crosettos respond that the trial court properly exercised its discretion to allow them to pursue a negligence claim against RGW unrelated to Dr. Sanders's negligence, noting that the court found RGW had sufficient notice of such a claim. The Crosettos maintain that disclosures made in certificates are preliminary and may be expanded upon as the litigation develops.

With exceptions not pertinent here, the Health Care Malpractice Claims Act ("the Act") "establishes exclusive procedures for filing a civil action [for medical malpractice] . . . against a health care provider." *Carroll v. Konits*, 400 Md. 167, 178 (2007); *see also* CJP § 3-2A-02(a). Pursuant to the Act, a plaintiff alleging medical malpractice must file

-14-

a claim with the HCADRO. CJP § 3-2A-04(a)(1)(i).[7] Within 90 days after filing such a claim, the plaintiff must "file a certificate of a qualified expert . . . attesting to departure from standards of care, and that the departure from standards of care is the proximate cause of the alleged injury[.]" CJP § 3-2A-04(b)(1)(i). "[A] report of the attesting expert" must be attached to the certificate. CJP § 3-2A-04(b)(3)(i).[8] After filing the certificate, the plaintiff may waive arbitration and pursue his claim in the circuit court. CJP § 3-2A-06B(b)(1). If a plaintiff fails to file the certificate before filing suit in the circuit court, the action must be dismissed without prejudice. *Carroll*, 400 Md. at 181 ("[W]e conclude that the filing of a proper [c]ertificate operates as a condition precedent to filing a claim in a [c]ircuit [c]ourt . . . .").[9] The Act further requires the filing of a

---

[7] The party bringing a claim in the HCADRO is referred to in the Act as a "claimant." Once arbitration is waived and the case is filed in the circuit court, that party is a "plaintiff." For ease of discussion, we shall use "plaintiff" to refer to both.

[8] There are certificate requirements for the health care provider defendant as well. *See* Courts and Judicial Proceedings § 3-2A-04(b)(2),(3); *Navarro-Monzo v. Washington Adventist Hosp.*, 380 Md. 195, 197 (2004) (holding that a defendant disputing liability must, within the prescribed time, "file a certificate from a qualified expert attesting either to compliance with the standard of care or that the alleged departure was not the proximate cause of the alleged injury"; otherwise, the "claim may be adjudicated in favor of the plaintiff on the issue of liability").

[9] Although the certificate requirement is a condition precedent to filing a medical malpractice case in circuit court, failure to satisfy that condition does not, as RGW suggests, divest the court of subject matter jurisdiction. *See Kearney v. Berger*, 416 Md. 628, 660 n.13 (2010) ("We have . . . explicitly rejected the notion that failure to satisfy the [Act's] procedures divests a trial court of subject matter jurisdiction." (citing *Oxtoby v. McGowan*, 294 Md. 83, 91 (1982))).

supplemental certificate of qualified expert "[w]ithin 15 days after the date that discovery is required to be complete[d]." CJP § 3-2A-06D(b). [10]

As we and the Court of Appeals have explained repeatedly, the purpose of the health claims arbitration process in general and the certificate requirement in particular is "to weed out non-meritorious claims and reduce the costs of litigation." *Wilcox v. Orellano*, 443 Md. 177, 184 (2015); *see also Kearney v. Berger*, 416 Md. 628, 645 (2010); *Walzer v. Osborne*, 395 Md. 563, 582 (2006); *D'Angelo v. St. Agnes Healthcare,*

---

[10] The supplemental certificate shall attest to:

(i)    The certifying expert's basis for alleging what is the specific standard of care;

(ii)   The certifying expert's qualification to testify to the specific standard of care;

(iii)  The specific standard of care;

(iv)   For the plaintiff:

1. The specific injury complained of;

2. How the specific standard of care was breached;

3. What specifically the defendant should have done to meet the specific standard of care; and

4. The inference that the breach of the standard of care proximately caused the plaintiff's injury[.]

CJP § 3-2A-06D(b)(1). If the plaintiff fails to file the supplemental certificate for each defendant, "on motion of the defendant the court may dismiss, without prejudice, the action as to that defendant[.]" CJP § 3-2A-06D(c)(1).

*Inc.*, 157 Md. App. 631, 645 (2004). Therefore, the plaintiff's certificate of qualified expert must "identify with specificity, the defendant(s) (licensed professional(s)) against whom the claims are brought, include a statement that the defendant(s) breached the applicable standard of care, and that such a departure from the standard of care was the proximate cause of the plaintiff's injuries." *Carroll*, 400 Md. at 172. The certifying expert's attached report must "explain how or why the physician failed . . . to meet the standard of care and include some details supporting the certificate of qualified expert." *Walzer*, 395 Md. at 583.

In *Carroll*, the plaintiff underwent a mastectomy after which a catheter was inserted in her chest for the administration of chemotherapy. The catheter was to be removed two months after she completed chemotherapy. It was not removed until nearly a year after that and, as a result, the plaintiff developed deep vein thrombosis and chronic venous stasis.

The plaintiff brought suit for medical malpractice against her oncologist and the surgeon who inserted the catheter, alleging that they "fail[ed] to communicate the need to have the catheter removed in a timely manner." *Carroll*, 400 Md. at 173. Her certificate of qualified expert was a letter by a doctor referencing five health care providers, including the two named defendants and two unidentified physicians, and stating generally that "'there was no clear communication to the patient[.]'" *Id.* at 197. The circuit court dismissed the action for failure to file a proper certificate of qualified expert.

The Court of Appeals affirmed. It held that the certificate was deficient because it "failed to state with sufficient specificity which physician or physicians breached the

standard of care and which physician or physicians were allegedly responsible for [the plaintiff's] injuries." *Id.* (emphasis omitted). It also "failed to state what the standard of care was or how [the defendants] departed from it." *Id.* The Court explained:

> Maryland law requires that the [c]ertificate mention explicitly the name of the licensed professional who allegedly breached the standard of care. . . . We believe that this requirement is consistent with the General Assembly's intent to avoid non-meritorious claims. Moreover, it is reasonable because the [c]ertificate would be rendered useless without an identification of the alleged negligent parties. When a [c]ertificate does not identify, with some specificity, the person whose actions should be evaluated, it would be impossible for the opposing party, the HCADRO, and the courts to evaluate whether a physician, or a particular physician out of several, breached the standard of care.

*Id.* at 196 (citations omitted).

Three years later, in *Kearney*, the Court of Appeals held that a certificate of qualified expert is deficient when it "fails to state the applicable standard of care and how the defendant allegedly departed from that standard of care . . . ." 416 Md. at 649–50. In that case, the plaintiffs sued a physician for failing to perform a timely biopsy of a mole, which turned out to be a melanoma. The complaint was accompanied by a certificate that stated, in relevant part, "'[i]t is my opinion that the care rendered fell below the standards of care applicable to the treatment of Mr. Kearney . . . and such deviation from the standards was the proximate cause of injury and damage to Mr. Kearney . . . .'" *Id.* at 634. No report was filed.

The Court concluded that the certificate was defective not only because it lacked a report but also because it did not include essential information that was required:

> [The] certificate d[id] not explain what the standard of care was, what [the physician] should have done to satisfy the standard of care, or include any

-18-

details at all about what happened when [the physician] allegedly violated the standard of care. Without this information, [the plaintiffs'] certificate could not be used to evaluate whether [the physician] violated the standard of care and is therefore deficient.

*Id.* at 650. The Court held that because the certificate was deficient, dismissal of the case was required under CJP section 3-2A-04(b).[11]

In *Barnes v. Greater Baltimore Medical Center, Inc.*, 210 Md. App. 457, 471 (2013), this Court held that, in the unusual posture of the case, dismissal was not mandated even though the certificate of qualified expert was deficient. The plaintiff sued a hospital and an emergency room physician for failing to take steps to prevent his stroke. He filed a certificate with an attached report and then waived arbitration. The case proceeded to trial in circuit court. The plaintiff's expert testified in detail as to how the physician and the hospital, through its identified triage nurse employee, breached the standard of care and as to how the breaches caused the plaintiff's injury. Mid-trial, the court was forced to declare a mistrial due to a major snowstorm. The re-trial was scheduled to take place more than a year later. The day before the re-trial, the hospital moved to dismiss on the ground that the plaintiff's certificate was deficient. The trial court denied the motion, ruling that it was filed too late. The second trial resulted in a verdict against the physician and the hospital.

---

[11] Three dissenters opined that a deficient certificate may be cured through discovery if the defendant is provided with the information that was otherwise required to be in the certificate.

-19-

On appeal, we upheld the court's decision to deny the hospital's motion to dismiss. We found that the certificate clearly was deficient in that the attached report stated only that the hospital "'departed from the applicable standards of care and that such departures are the proximate cause of the alleged injuries and damages.'" *Id.* at 468. We concluded, however, that the testimony of the plaintiff's expert at the first trial, in which he specified the standard of care applicable to the triage nurse, explained how she breached the standard of care, and opined as to how her breach caused the plaintiff's injury, "cured the report's apparent lack of detail[.]" *Id.* at 474. We reasoned that it would be "illogical" to dismiss the case under the circumstances, noting that when the legislature enacted the certificate requirement it likely did not "envision[] that a case would have to be retried when the only remedy is for the plaintiff to give the defendants something that they already had before trial." *Id.* at 477. We made clear that our holding was narrow: "we express no opinion on whether subsequent discovery or trial testimony can cure deficiencies other than the one at issue in this case. Indeed, our decision may have been very different if there had not been a mistrial[.]" *Id.* at 479.

These cases stand for the proposition that, barring extraordinary circumstances, the plaintiff's certificate of qualified expert and report must timely disclose the requisite standard of care, how the standard was breached, who breached it, and how the breach proximately caused the plaintiff's injury. The Crosettos' argument that a plaintiff's certificate of qualified expert is merely preliminary is taken out of context and is not relevant here. They rely on *Debbas v. Nelson*, 389 Md. 364 (2005), which stands for the (different) proposition that an original certificate that was proper when filed does not

become defective retroactively when the certifying expert later gives testimony that is inconsistent with it. The *Debbas* Court held that a plaintiff should not be bound by his or her "original [c]ertificate" that was filed before discovery ensued. *Id.* at 383. This makes sense because discovery may reveal information that was unknown to the plaintiff when the original certificate was filed and that supports new theories of liability, including theories against health care providers not identified in the original certificate.[12]

That is not the issue here. The original certificate did not identify any health care provider other than Dr. Sanders as having breached the standard of care. If, in the course of discovery, the Crosettos had learned information that caused Dr. Josephberg to alter his opinions from those specified in the original certificate, he could have done so, as long as the procedures were followed. Dr. Josephberg's supplemental certificate *also* did not identify any health care provider agent of RGW, other than Dr. Sanders, as having breached the standard of care, however. Moreover, Dr. Josephberg did not state that the standard of care required that eye pressure-lowering medication be given prior to the surgery.

---

[12] There may be situations in which, until discovery is undertaken, the plaintiff cannot determine the name of a health care provider agent whose conduct is implicated in causing the injury or death at issue. Until clarified in discovery, the health care provider agent can be identified by position or role. Similarly, there may be situations in which only through discovery does it become known that a particular health care provider agent was involved in the care at issue at all. Under the holding in *Debbas v. Nelson,* 389 Md. 364 (2005), the plaintiff's certifying expert's supplemental certificate, filed after the close of discovery, can attest to a breach of the standard of care by such an agent and, of course, should fully identify all health care provider agents alleged to have breached the standard of care.

Absent any mention of Dr. Desai, Dr. Warrow, or any agent of RGW other than Dr. Sanders in either certificate, it is clear that the Crosettos could not pursue a medical malpractice claim against RGW based on the purported negligence of Dr. Desai, Dr. Warrow, or any other such agent. It also is clear that the Crosettos' second amended complaint could not and did not cure this deficiency. A plaintiff may not file a certificate identifying an act of medical malpractice by a health care provider, whether individually or as an agent, waive out of the HCADRO and into circuit court, and then target another health care provider as having committed malpractice, without filing a certificate as to that defendant. The Act specifically provides a vehicle by which a defendant who was not named in the arbitration proceeding may be joined, and that procedure requires that the plaintiff file a certificate identifying the new defendant and specifying the applicable standard of care and that the defendant breached it, causing the plaintiff's injuries. CJP § 3-2A-06B(g).

Here, from the beginning, the Crosettos and their lawyer were aware of Dr. Desai's existence and his participation in Mr. Crosetto's care. They did not name him as a defendant and their certificates of qualified expert did not identify him as having breached the standard of care in his treatment of Mr. Crosetto. Likewise, they did not name Dr. Warrow as a defendant and did not identify him as having breached the standard of care.

In its November 15, 2016 pre-trial ruling on RGW's opposition to the proposed special verdict, the court stated that the theory that an agent of RGW other than Dr. Sanders was negligent was "out there" and could have been explored in discovery. This

-22-

was incorrect as a matter of law and fact. As noted, Dr. Josephberg's post-discovery certificate did not identify Dr. Desai or any agent of RGW except Dr. Sanders as having breached the standard of care.[13] The burden was on the Crosettos, as the plaintiffs, to submit proper certificates specifying *who* breached the standard of care. It was not on RGW, as a defendant, to pursue discovery so as to uncover an alleged breach that easily could have been identified in the required certificates. Moreover, when counsel for RGW deposed Dr. Josephberg and asked whether he would be providing any opinion at trial as to whether Dr. Warrow breached the standard of care, his inquiry was cut short:

> [The Crosettos' Counsel]: Objection, it's speculative. Dr. Warrow is not a party, and I don't see the relevance of what opinion our expert here has whether or not Dr. Warrow breached the standard of care. That's not relevant.
>
> [RGW's Counsel]: It absolutely is. I mean, are you planning on -- I take it you're not, but you're not asserting any claim against Dr. Warrow, correct? I want to make sure that we're not going to be hearing testimony from Dr. Josephberg at trial that Dr. Warrow also deviated from the standard of care.
>
> [The Crosettos' Counsel]: *Did Dr. Josephberg put in his Certificate of Merit that Dr. Warrow violated a standard of care? No, he did not.*
>
> [RGW's Counsel]: *No.*

---

[13] To be sure, a health care provider agent need not be sued individually for the agent's principal to be liable under *respondeat superior*. It is sufficient that the principal is sued. However, the health care provider agent—or agents—must be identified in the certificate of qualified expert and the certificate must state for each agent the standard of care applicable to that agent, how it was breached, and that the breach proximately caused the claimed injuries. In this case, for example, the Crosettos could have sued RGW without also suing Dr. Sanders. But their certificate of qualified expert would have to have identified Dr. Sanders, the standard of care that applied to him, how he violated it, and that the violation proximately caused the claimed injuries.

[The Crosettos' Counsel]: *This deposition is about his opinions as to Dr. Sanders. And so any deviation here is out of bounds, so I object.*

(Emphasis added.) Obviously, the negligence of any health care provider other than Dr. Sanders was not going to be a subject for exploration at Dr. Josephberg's deposition, even if that would have made a difference (which it would not have).

For the same reason it erred in denying RGW's pre-trial opposition to the proposed special verdict sheet, the court erred in ruling, on RGW's motion for judgment during trial, that the question whether RGW was negligent through the acts or omissions of an agent other than Dr. Sanders was for the jury to decide. In the absence of a certificate properly identifying an agent other than Dr. Sanders as having breached the standard of care, that issue was not a proper one to be submitted to the jury.

Finally, we note that the allegations against RGW in this case always have been based on *respondeat superior*. RGW is an organization and, as such, "can act only by virtue of its agents." *Southern Mgmt. Corp. v. Taha*, 378 Md. 461, 479 (2003) (citing *Hecht v. Resolution Trust Co.*, 333 Md. 324, 345 (1994)). The cryptic sentence in Dr. Josephberg's certificate "[t]hat after surgery Dr. Sanders *or* RGW failed to monitor Mr. Crosetto" (emphasis added) did not provide RGW with the information it needed to evaluate who, other than Dr. Sanders, violated the standard or care. *See Carroll*, 400 Md. at 196. Furthermore, contrary to some of the arguments made before this panel on March 5, 2018, there never was a supported, substantive assertion that RGW as an entity

somehow committed medical malpractice.[14] There also never was an allegation that RGW and FASC were related or that agents of FASC committed malpractice in Mr. Crosetto's treatment.

In sum, because Dr. Josephberg did not certify any claims of medical negligence against any agent of RGW other than Dr. Sanders, it was improper for the trial court to allow the Crosettos to pursue a claim at trial that RGW was vicariously liable for the acts or omissions of an agent or agents of RGW other than Dr. Sanders.

**II.**

RGW also contends the evidence at trial was legally insufficient to support the verdict against it, and therefore the trial court erred by denying its motions for judgment and JNOV. We agree.

"An appellate court reviews the [circuit] court's decision to allow or deny judgment or JNOV to determine whether it was legally correct[.]" *Scapa Dryer Fabrics, Inc. v. Saville*, 418 Md. 496, 503 (2011) (quotations omitted). A trial court errs as a matter of law in denying a motion for judgment or for JNOV when the evidence, "taken in the light most favorable to the nonmoving party, does not legally support the nonmoving party's claim or defense." *Bartholomee v. Casey*, 103 Md. App. 34, 51 (1994) (citing *I.O.A. Leasing Corp. v. Merle Thomas Corp.*, 260 Md. 243, 248–49

---

[14] We note that it is questionable whether RGW is a health care provider, within the meaning of CJP section 3-2A-01(f), and therefore could be subject to medical malpractice liability other than through the acts or omissions of its health care provider agents.

(1971)); *see also Barnes*, 210 Md. App. at 486 ("The standard for granting a motion for judgment is legal sufficiency of the evidence, the same as a JNOV." (citing *Orwick v. Moldawer*, 150 Md. App. 528, 531 (2003))). Accordingly,

> [i]f the record discloses any legally relevant and competent evidence, however, slight, from which the jury rationally could have found as it did, we must affirm the denial of the appellants' motions. . . . If, however, the evidence as a whole does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty, then the denial of appellants' motions for judgment or JNOV was error.

*Bartholomee*, 103 Md. App. at 51.

RGW maintains that the evidence was legally insufficient to support a reasonable finding that one of its agents, other than Dr. Sanders, was negligent. It points out that Dr. Josephberg did not testify to a reasonable degree of medical certainty that one of its other agents, including Dr. Desai, deviated from the standard of care. Therefore, the jurors only could have speculated as to whether someone other than Dr. Sanders breached the standard of care. The Crosettos counter that when the evidence is evaluated in the light most favorable to them, "there was ample proof . . . supporting the jury's verdict."

"Because of the complexity of medical malpractice cases, the Court of Appeals has made clear that, in such cases, there ordinarily must be expert testimony to establish breach of the standard of care and causation." *Tucker v. Univ. Specialty Hosp.,* 166 Md. App. 50, 58 (2005) (citing *Meda v. Brown*, 318 Md. 418, 428 (1990)). Additionally, expert testimony must be based upon a reasonable degree of probability. *See Karl v. Davis*, 100 Md. App. 42, 52 (1994) (citing *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 666 (1982)). We have explained that while

[t]here is no appellate court opinion in Maryland that has held that the mantra 'within a reasonable degree of medical probability' is absolutely required before each and every medical expert opinion[, i]t is understood . . . that these wooden phrases are required to make sure that expert's opinion is more than speculation or conjecture.

*Id.* (quotations and citations omitted).

Dr. Josephberg's trial testimony was not such as to permit a finding by reasonable jurors that Dr. Desai breached the standard of care or that such a breach was the cause of Mr. Crosetto's injury. Dr. Josephberg criticized Dr. Desai, testifying in an off-hand response to a question about Mr. Crosetto's discharge to home following surgery that "29 pressure was definitely something that should have been treated pre-surgery." Dr. Josephberg did not testify to a reasonable degree of medical certainty that the standard of care required Dr. Desai (or anyone else) to treat the IOP with medication two days prior to surgery and that the failure to do so was a breach of the standard of care.[15]

Likewise, the evidence was legally insufficient to support a reasonable finding that RGW was vicariously liable for any agent's negligence in failing to monitor Mr. Crosetto post-surgery because, other than Dr. Sanders, there was no evidence identifying an agent who failed to monitor Mr. Crosetto. "Under the doctrine of *respondeat superior*, an employer is vicariously liable for a tort committed by its employee while acting within the scope of his employment." *Women First OB/GYN Assocs., L.L.C. v. Harris*, 232 Md.

---

[15] Nor did Dr. Josephberg testify to a reasonable degree of medical certainty that any failure to treat the IOP with medication prior to surgery proximately caused Mr. Crosetto's injury. RGW's motions for judgment and JNOV were based solely on the standard of care and breach elements of the cause of action, however, not on causation.

App. 647, 657 (2017). In order for the employer to be vicariously liable, there must necessarily have been an employee who acted negligently. *See* Restatement (Third) of Agency § 7.07, cmt. b. (Am. Law Inst 2006). ("Respondeat superior is a basis for vicarious liability when an *identifiable* employee-actor commits a tort in an interaction with a third party.") (emphasis added).

Here, the jurors only could have guessed whether some person other than Dr. Sanders was present following surgery, whether that person was an agent of RGW, whether it would have been that person's responsibility to monitor Mr. Crosetto, and, if so, whether that person breached the standard of care. Indeed, Dr. Josephberg's own testimony belies the assertion that an agent of RGW other than Dr. Sanders deviated from the standard of care by failing to monitor Mr. Crosetto post-surgery. On direct examination, Dr. Josephberg was asked whether RGW's failure to monitor Mr. Crosetto after surgery caused his injury. He responded that, "[i]f Dr. Sanders is an employee of RGW then they would have breached the standard of care."

It was the Crosettos' burden to introduce evidence from which the jurors could have found to a reasonable degree of medical probability that an agent of RGW other than Dr. Sanders deviated from the requisite standard of care and caused Mr. Crosetto's vision loss, and, for the aforementioned reasons, they failed to do so.

Finally, we note, as we did in addressing the first question, that there never was a suggestion, and certainly not one borne out by any evidence, that the Crosettos were pursuing RGW for liability as an entity, and not for vicarious liability. The verdict sheet that the Crosettos advocated being used allowed a finding against RGW based solely on

-28-

*respondeat superior*.  There was no such evidence, other than the evidence against Dr. Sanders, and the trial court's remark, in denying RGW's JNOV motion, that RGW had been on "ample notice" that it "was and became an independent defendant" was inconsistent with the evidence adduced at trial (and discovery) and with the special verdict submitted to the jury.

The jury found that Dr. Sanders did not breach the standard of care, which means that he was not negligent.  Upon the evidence presented, the jurors only could have found RGW negligent if Dr. Sanders was negligent.  Accordingly, the verdict against RGW cannot stand.  *See Southern Management v. Taha*, *supra*.

> **JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AGAINST THE RETINA GROUP OF WASHINGTON, P.C., REVERSED.  COSTS TO BE PAID BY THE APPELLEES.**